RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

MELISA RICHMOND,

  *Plaintiff-Appellant*,

*v.*

  No. 16-2560

RUBAB HUQ, et al.,

  *Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:14-cv-14892—John Corbett O'Meara, District Judge.

Argued: July 28, 2017

Decided and Filed: March 22, 2018

Before: MOORE, STRANCH, and DONALD, Circuit Judges

———————

## COUNSEL

**ARGUED:** Kenneth D. Finegood, KENNETH D. FINEGOOD, PLC, Southfield, Michigan, for Appellant. Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees. **ON BRIEF:** Kenneth D. Finegood, KENNETH D. FINEGOOD, PLC, Southfield, Michigan, for Appellant. Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees.

———————

## SECOND AMENDED OPINION

———————

BERNICE BOUIE DONALD, Circuit Judge. Plaintiff Melisa Richmond was incarcerated in the Wayne County Jail from December 26, 2012 through February 13, 2013.

While in the custody of the Jail, Richmond received treatment for a self-inflicted burn wound on her chest as well as for psychological needs.  Richmond contends that she received constitutionally inadequate treatment for her burn wound, which necessitated skin grafting surgery shortly after her release from the Jail's custody.  She also contends that she was unconstitutionally deprived of her psychiatric medication for over two weeks while in custody.  The district court below granted summary judgment in favor of the Defendants on the grounds that Richmond failed to show a constitutional violation.  For the reasons described below, we **REVERSE in part** and **AFFIRM in part** the ruling of the district court.

I.

A.

Plaintiff Melisa Richmond was arrested on December 25, 2012 in relation to an altercation at a family gathering in the City of Wyandotte, Michigan.  After the police arrived at the scene, Lance Granata, Richmond's adult son, engaged in a verbal and physical altercation with the responding officers, who used a taser to subdue Mr. Granata.  Witnessing this altercation, Richmond attempted to interfere with the arresting officers, at which point she was arrested and taken into custody.  While in the police cruiser after her arrest but before her booking, Richmond suffered a self-inflicted burn wound as a result of setting her seatbelt on fire allegedly in an attempt to free herself and reunite with her son.  After discovering and extinguishing the fire, police officers transported Richmond to Henry Ford Wyandotte Hospital for treatment.  At the hospital, Richmond was treated for first to second degree burns and discharged into police custody.  The treating physician at the hospital prescribed Richmond silvadene cream to be applied twice a day.[1]  Following her discharge that evening, Richmond was taken to the city jail. The next day, December 26, 2012, Richmond was arraigned and placed in the custody of the Jail, where she remained until being released on bond on February 13, 2013.

On December 26, 2012, after her arraignment, Richmond was screened for medical and mental health issues by a member of the Jail medical staff.  The screener took note of

---

[1]Although these instructions require that Richmond's dressing be changed twice daily, once she arrived at the Jail, Richmond was prescribed once a day dressing changes.  This once-a-day instruction was confirmed after Richmond's January 11 visit to the Jail clinic.

Richmond's burn wound as well as her previous mental health history and designated that follow-up medical and mental health evaluations would be necessary. The same evening, Defendant-Appellee Nurse Shevon Fowler examined Richmond, changed her wound dressing, referred her to a psychiatric social worker, and paged the on-call doctor, who in turn ordered once daily, rather than twice daily, dressing changes and prescribed her Lortab for pain.[2] On December 27, Richmond received two doses of Lortab and Defendant-Appellee Nurse Maxine Hawk changed her dressing. On December 28, Richmond received three doses of Lortab and was seen by Defendant-Appellee Dr. Rubab Huq, who prescribed Motrin and antibiotics to prevent infection, allegedly changed Richmond's dressing, and scheduled a follow-up medical visit for January 10, 2013. Also on December 28, Richmond received a mental health screening by Agron Myftari, a psychiatric social worker. During this screening, Richmond and Myftari discussed Richmond's prior history of bipolar disorder and her then-current medications which included Prozac and Xanax. After his screening, Myftari scheduled Richmond for a January 11, 2013 appointment with a psychiatrist. However, Myftari determined that Richmond was stable enough to wait for her psychiatric appointment without medication, and that if her condition changed, Richmond could be admitted to the mental health inpatient unit immediately.

On December 29, Richmond received three doses of Lortab. However, she did not receive a complete dressing change because Defendant-Appellee Nurse Jacqueline Lonberger was allegedly intentionally aggressive while cleaning the wound, causing unnecessary pain. After advising Richmond that some pain was inevitable while cleaning a wound such as hers, Nurse Lonberger allowed Richmond to return to her cell without a dressing change, noting that Richmond did not present symptoms that would require a more drastic treatment, such as hospitalization. On December 30, Richmond received two doses of Lortab, and Nurse Lonberger changed her dressing. From December 31, 2012 through January 4, 2013, Richmond received Lortab twice a day and had her dressing changed by Nurse Hawk, with the exception of January 3, when Richmond missed her scheduled dressing change because she was in court.

---

[2]Richmond was prescribed 1 tablet of Lortab every eight hours, for a total of three daily doses. However, Jail policy was to not wake inmates if they were sleeping when pain medication was to be administered.

On January 5, Richmond received two doses of Lortab, and her dressing was changed by Defendant-Appellee Medical Assistant Danielle Allen.  On January 6, Richmond received two doses of Lortab, but there is no indication that her dressing was changed.  On January 7, Richmond received three doses of Lortab, and her dressing was again changed by Allen.  That day, Richmond also saw Defendant-Appellee Patricia Rucker, another psychiatric social worker, regarding the Jail's failure to provide her psychiatric medication.  Because Richmond stated that she had not yet been evaluated, Rucker sent Richmond down to the mental health unit for another screening.  During this second mental health screening, a third social worker, Jim Gilfix, determined that Richmond was stable and could await her previously scheduled appointment without any psychiatric medication, even though he was aware that Richmond had been taking Prozac and Xanax prior to being taken into custody.  On January 8, Richmond received three doses of Lortab, but there is no indication that her dressing was changed.  On January 9, Richmond received three doses of Lortab, and Allen again changed her dressing.  On January 10, Richmond received two doses of Lortab, but did not receive her daily dressing change because she was in court.

On January 11, the day of Richmond's follow-up physical and psychiatric evaluations, she received two doses of Lortab.  Prior to her evaluations, Richmond was triaged by Defendant-Appellee Nurse April Williams, who examined her wound.  Immediately afterwards, Richmond was seen by Defendant-Appellees Nurse Practitioner Marie Shoulders and Dr. Thomas Clafton.  Nurse Shoulders testified that she changed the dressing during the examination, but this change is not reflected in Richmond's chart.  After this visit, Richmond was prescribed additional medication, including silvadene ointment to be used during the once-daily dressing changes.  Nurse Shoulders testified that her post-visit notation would have clarified any confusion caused by a January 9 note, allegedly included in Richmond's chart by mistake, which required twice daily dressing changes.  Later in the afternoon of January 11, Richmond was seen by psychiatrist Dr. Lisa Hinchman, who diagnosed Richmond with bipolar disorder, depression, and Post Traumatic Stress Disorder.  Dr. Hinchman prescribed medication to treat Richmond's mental ailments, but she did not prescribe Xanax, Prozac, or their generic equivalents—the medication Richmond indicated she had been taking prior to her incarceration.  Richmond makes no further claims regarding her psychiatric treatment after Dr. Hinchman's treatments.

On January 12, Richmond received three doses of Lortab, and her dressing was changed. Richmond received three doses of Lortab on January 13 and two doses on January 14. After January 14, Richmond was switched to over the counter pain medication that could be kept in her cell. There is no indication that Richmond's dressing was changed on January 13, 14, 15, 17 or 18. Richmond's dressing was changed by the Jail staff on January 16, 19, 20, 21, and 22. The notes from January 21 indicate that Richmond was provided the supplies necessary to begin changing her dressing herself. On January 27, Richmond was again provided with the supplies necessary to change her dressing on her own. On January 29, Richmond visited the Jail clinic for a scheduled appointment. She was triaged by Defendant-Appellee Nurse Felecia Coleman before being seen by Nurse Shoulders. Nurse Shoulders noted Richmond's claims that she had not had the supplies to clean and dress her wound for the past week, but determined that the wound was in various stages of healing and was not infected. Nurse Shoulders explained to Richmond that she was to change the dressing twice daily and noted that Richmond expressed an understanding and willingness to comply with these instructions. Nurse Shoulders also testified that her practice would have been to change Richmond's dressing at this visit. There is no record of any further encounters between Richmond and the Jail's medical staff prior to Richmond's release on February 13.

Richmond made a consistent effort to report problems with her treatment. The record contains her "kites" or grievances, which are dated January 7, 13, 19, 23, and 24. In each kite, Richmond noted how the medical care provided to her by the Jail fell short of what had been ordered at the hospital and/or by the Jail physicians. Specifically, Richmond noted that the medical staff failed to change her dressing, that she had been forced to wear an old and dirty dressing on her wound, that she feared her wound was infected, and that she did not receive medication prescribed by the Jail doctors. These kites conflict with some of the Jail's internal logs regarding the care Richmond received.

After her release, Richmond saw Dr. Andrei Katychev regarding her wound, which he cleaned and examined. Dr. Katychev noted that parts of the wound had still not healed, but he did not note any sign of infection. Dr. Katychev referred Richmond to the Detroit Medical Center Burn Center. During her visit to the Burn Center, Richmond was informed that she

would need a skin graft because a portion of her wound was not healing by itself.  Richmond underwent the grafting procedure on February 22, 2013.

### B.

Richmond filed the underlying suit on December 24, 2014, alleging violations of her Eighth Amendment right to be free from cruel and unusual punishment.  Her claims arise out of the medical treatment she received while in the Jail's custody from December 26, 2012 through February 13, 2013.  Specifically, she alleges that the Jail's medical staff did not provide the prescribed number of dressing changes and doses of medication.  She also contends that the Jail violated her Eighth Amendment right by not providing her psychiatric treatment or medication during the first three weeks that she was in custody and that Wayne County is liable as a municipality for the practice followed by the Jail's psychiatric social workers of delaying prisoner's access to their psychiatric medication.

### II.

This Court reviews a district court's grant of summary judgment de novo.  *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016).  Summary judgment is only appropriate where there is "no genuine issue as to any material fact" and defendants are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," this Court must view all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *Id.* at 251–52, 255.

The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment.  The Due Process Clause of the Fourteenth Amendment provides the same protections to pretrial detainees.  *See Richko v. Wayne Cty*, 819 F.3d 907, 915 (6th Cir. 2016).  This Court has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims "under the same rubric."  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).  "[A] prisoner's Eighth Amendment right is violated when

prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The clearly established right to be free from deliberate indifference to medical needs extends to an inmate's psychiatric needs. *Id.* (citing *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)); *see also Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006).

An Eighth Amendment claim on these grounds is comprised of an objective and a subjective[3] component. *Clark-Murphy*, 439 F.3d at 286. The objective component requires the plaintiff to show that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Thus, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* (citations and internal quotation marks omitted). Further, this Court has held that "a medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)); *see also Friend v. Rees,* 779 F.2d 50, 1985 WL 13825, at *3 (6th Cir. Oct.1, 1985)). In addition, "[w]e have held that a prisoner's 'psychological needs may constitute serious medical needs, especially when they result in

---

[3]The Supreme Court in *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466 (2015), held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. This Court has not yet considered whether *Kingsley* similarly abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim. Several of our sister courts have and are split. *Compare Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) (holding that the "subjective prong" of a claim of deliberate indifference to conditions of confinement under the Fourteenth Amendment must be "defined objectively" in light of *Kingsley*) *and Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), *cert. denied sub nom. Los Angeles Cty. v. Castro*, 137 S. Ct. 831 (2017) (interpreting *Kingsley* to mean that a failure-to-protect claim brought by a pretrial detainee under the Fourteenth Amendment does not include a subjective intent element), *with Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (finding that because the Fifth Circuit continued "to apply a subjective standard [in failure-to-protect claims] post-*Kingsley*, this panel is bound by our rule of orderliness"). We find no circuit applying *Kingsley* specifically to a deliberate indifference to a detainee's serious medical needs claim. *But see Alderson*, 848 F.3d at 424-45 (Graves, J., specially concurring in part) (calling into question whether that court should have reconsidered the deliberate indifference standard in light of *Kingsley*). Yet, neither party cites *Kingsley* or addresses its potential effect in their briefing. Nonetheless, we recognize that this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them.

suicidal tendencies.'" *Comstock*, 273 F.3d at 703 (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir.1994)).

Richmond's claims center around the Jail staff's failure to change her dressings as prescribed, to provide her with pain medication as prescribed, and to provide her with psychiatric medication for the first three weeks of her incarceration in spite of their knowledge that she had been taking such medication prior to her incarceration. Like the doctors at the Henry Ford Wyandotte Hospital, the Jail's own physicians determined that Richmond's burn wound required daily treatment. Indeed, Richmond's burn was serious enough to require a skin graft after her release. Likewise, both outside physicians and the Jail psychiatrist, Dr. Hinchman, determined that Richmond needed treatment in the form of medication to manage her psychiatric needs. The gravity of Richmond's mental health needs is evidenced by the burn itself, which was the product of self-harm caused when Richmond lit the seatbelt restraining her on fire. The Jail's intake records also note that Richmond reported her previous attempted suicide. Defendants do not challenge Richmond's contention that these medical needs are "sufficiently serious" to satisfy the objective component. Thus, both Richmond's physical and mental ailments constitute serious medical needs so as to satisfy the objective component.

The subjective component requires a showing that the "official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "An express intent to inflict unnecessary pain is not required." *Whitley v. Albers*, 475 U.S. 312, 319 (1976) (citation omitted). Rather, "obduracy and wantonness" are required to make a showing of deliberate indifference. *Boretti v. Wiscomb*, 930 F.2d 1150, 1153 (6th Cir. 1991). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Failure by a jail medical staff to adhere to a prescribed course of treatment may satisfy the subjective component of an Eighth Amendment violation. We have held that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those

whose deliberate indifference is the cause of his suffering." *Boretti*, 930 F.2d at 1154-55. This Court has found deliberate indifference where the medical staff allegedly refused to examine or change the dressing for a prisoner's wound altogether in spite of several direct requests. *Id*. at 1154. Further, the "interruption of a prescribed plan of treatment could constitute a constitutional violation." *Id*. (citing *Estelle*, 429 U.S. at 105). "The fact that the wound healed is not dispositive" of whether the defendant was deliberately indifferent to the prisoner's serious medical need, as the "pain and mental anguish" endured is itself sufficient to constitute cruel and unusual punishment. *Id*. at 1154-55; *see also Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). However, this Court "distinguish[es] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment," such that where medical care is merely inadequate, this Court is "generally reluctant to second guess medical judgments." *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake*, 537 F.2d at 860 n.5). Nevertheless, treatment may be constitutionally impermissible when it is "so woefully inadequate as to amount to no treatment at all." *Id.* With these standards in mind, we turn to the subjective culpability of the Jail Defendants who were responsible for treating Richmond during her confinement.

## A. Defendant Dr. Thomas Clafton

Dr. Clafton was the Medical Director of the Wayne County Jail at the time Richmond was in the Jail's custody. Through his position, Dr. Clafton was responsible for the daily medical care of the inmates in the Jail. Dr. Clafton saw Richmond during her January 11 follow-up medical appointment. At that point, Richmond's medical records showed that her dressing had not been changed on six out of the sixteen days she had been in custody and that she had missed ten out of 48 dosages of Lortab. Richmond had also started to complain of inadequate treatment by January 11. However, there is nothing in the record to suggest that Dr. Clafton did anything to determine why Richmond's dressing had not been changed on certain days or took any steps to ensure that his order regarding dressing changes and pain medication would be implemented every day as prescribed. Richmond argues that this is enough to constitute deliberate indifference to her serious medical needs.

It is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs; rather, "the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). Richmond need not show that any of the Jail staff consciously ignored her, "only that [her] serious medical needs were consciously disregarded." *Id.* (citations omitted). The *Boretti* Court held that the evidence of the lack of the provision of care, in spite of evidence of the development of "an ongoing medical plan for the treatment of plaintiff's wound" and in spite of the fact that the wound healed without infection, may be the basis of a claim of "deliberate indifference to serious medical needs." *Boretti*, 930 F.2d at 1154. At the time of Richmond's January 11 appointment with Dr. Clafton and Nurse Shoulders, Richmond's medical records show that the Jail staff failed to change Richmond's dressing six times during her sixteen day confinement. Richmond also testified that she sought additional treatment from Dr. Clafton as late as January 24th, by which point the Jail staff had failed to change Richmond's dressing on at least five additional occasions.[4] After his first visit with her, Dr. Clafton did order that Richmond's existing plan of treatment be continued. However, there is a question of fact regarding whether he reviewed Richmond's chart, which showed that the plan of treatment had not been strictly been followed—that question is material to the determination of whether Dr. Clafton consciously disregarded the risk that Richmond's serious medical need may not receive the treatment prescribed.

The Defendants assert that Richmond's claims against Dr. Clafton boil down to a disagreement over the adequacy and type of treatment Dr. Clafton ordered. Accordingly, the Defendants argue, this Court should be reluctant to second guess the Jail staff's medical judgments "unless the medical treatment is so woefully inadequate as to amount to no treatment at all." *Asplaugh*, 643 F.3d at 169. The Defendants are correct that to the extent Richmond challenges the adequacy of her treatment, this Court is deferential to the judgments of medical professionals. However, as noted above, Richmond also argues that Dr. Clafton "fail[ed] to provide the care that was ordered." *See* Appellant Brief at 42. As discussed, there is a question

---

[4]The staff missed two additional doses of Lortab after January 11, but by January 24 Richmond was capable of keeping her pain medication in her cell.

of fact whether Dr. Clafton viewed Richmond's chart. A reasonable jury could find that Dr. Clafton reviewed or should have reviewed Richmond's chart, which would have made him aware of the risk that the Jail medical staff had and would continue to fail to adhere to his prescribed plan of care, and that he subsequently disregarded that risk by failing to ensure that his orders were implemented as prescribed.[5] This is especially true in light of Richmond's well-documented complaints. Such a finding of the failure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference to an inmate's serious medical needs. *Boretti*, 930 F.2d at 1154. Thus, summary judgment in favor of Dr. Clafton on this claim is inappropriate.

Richmond also claims that Dr. Clafton violated her Eighth Amendment right by not providing her with timely access to her psychiatric medication. However, Dr. Clafton treated Richmond on the same day that she was scheduled to see the psychiatrist, Dr. Hinchman. There is nothing in the record to suggest that Dr. Clafton could have provided Richmond with psychiatric medication sooner than Dr. Hinchman, whose care Richmond found to be satisfactory. As such, the district court properly granted summary judgment to Dr. Clafton on claims related to the timely provision of Richmond's psychiatric medication.

### B. Dr. Rubab Huq

Dr. Huq was employed as a physician serving the inmates of Wayne County Jail at the time of Richmond's incarceration. Dr. Huq examined Richmond on December 28, 2012. During this visit, Dr. Huq observed the burn wounds on Richmond's chest, prescribed additional medication to ward off infection, and scheduled a follow-up appointment for January 10, 2013. Unlike the case with Dr. Clafton, at the time Dr. Huq treated Richmond, the Jail medical staff had yet to miss a dressing change, although it had missed one dosage of pain medication. Although there is some dispute over whether Dr. Huq herself changed Richmond's dressing that day, the record does not support a finding that Dr. Huq was aware of the risk that the prescribed course of treatment might go unimplemented.

---

[5]Because Dr. Clafton knew that Richmond's burn constituted a serious medical need, a reasonable jury could conclude that failing to review Richmond's existing plan of treatment constituted deliberate indifference and "consciously expos[ed] the patient to an excessive risk of serious harm." *See LeMarbe*, 266 F.3d at 439.

Richmond also argues that Dr. Huq could have been more aggressive in treating her wounds; specifically, Dr. Huq could have prescribed more pain medication or recommended that Richmond be transferred to a burn center.  However, as the Defendants note, "[w]here a prisoner alleges only that the medical care received was inadequate, federal courts are generally reluctant to second guess medical judgments unless the medical treatment is so woefully inadequate as to amount to no treatment at all." *Asplaugh*, 643 F.3d at 169.  Richmond does not contend that the plan of treatment prescribed by Dr. Huq was so inadequate as to amount to no treatment at all, but rather that the plan was both insufficient and not fully implemented by others.  However, it was not Dr. Huq's role to implement the course of treatment, and there are no facts in the record to suggest that Dr. Huq was ever aware that the treatment was not being implemented as he prescribed.  Further, Dr. Huq scheduled a follow-up appointment for Richmond presumably to monitor the healing process.  Regarding the necessity of a burn specialist, both Dr. Huq and the hospital physician who had recently released Richmond into the Jail's custody determined that such a specialist was not necessary.  It would be improper for this court to overturn their medical judgment.  Thus the district court correctly granted summary judgment on Richmond's claims against Dr. Huq related to the treatment of her burn.

However, unlike Dr. Clafton, there is a question of fact as to whether Dr. Huq was made aware of Richmond's need for psychiatric medication well in advance of Richmond's visit with Dr. Hinchman.  The record from Nurse Fowler's first visit with Richmond on the day Richmond was brought into the Jail's custody indicates that Richmond had been on Prozac and Xanax prior to entering into the custody of the Jail and that her last dose was taken on December 25, 2012.  Although this notation was in Richmond's records, it is not clear from the record whether Dr. Huq actually reviewed that particular document.  A "prison official[] who ha[s] been alerted to a prisoner's serious medical needs [is] under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702 (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989)).  This obligation extends to an inmate's serious psychiatric needs.  *Id*; *see also Clark-Murphy*, 439 F.3d at 292.  A reasonable jury could find that Dr. Huq was aware of Richmond's serious need for psychiatric medication, as evidenced by Nurse Fowler's notation, and that she failed to take reasonable steps to ensure that Richmond received her medication, such as prescribing them herself or even simply requesting that a nurse check with Richmond's outside

doctor or pharmacy to verify her prior prescriptions. Because there is a question of fact as to whether Dr. Huq was deliberately indifferent to Richmond's serious medical need, summary judgment is not appropriate on this issue.

## C. Agron Myftari

Defendant-Appellee Myftari was employed as a psychiatric social worker at the time of Richmond's incarceration in the Jail. As a psychiatric social worker, Myftari was not able to prescribe medication himself. Rather, in that position, Myftari was responsible for providing psychiatric evaluations of inmates and determining the extent of their psychiatric needs. If Myftari determined that an inmate required psychiatric care, he would place that inmate either in the Mental Health Outpatient Program or the Mental Health Inpatient Program. An inmate admitted to the Mental Health Inpatient Program may receive psychiatric medication immediately upon arrival in the unit. However, an inmate admitted into the Mental Health Outpatient Program must wait until she is seen by a psychiatrist before being prescribed any psychiatric medication even where it is known that the inmate was taking medication prior to being admitted by the Jail.

In the present case, Myftari diagnosed Richmond as bipolar, suffering from depression, anxiety and auditory hallucinations. He noted that Richmond had recently been treated for her mental health issues and that she was taking Prozac and Xanax, with her last dose being December 25, 2012. Notwithstanding these findings, he placed Richmond in the Mental Health Outpatient Program, which meant she would not receive any psychiatric medication until after a follow-up visit with a psychiatrist, which was scheduled for January 11, 2013. His reasoning for this placement was that Richmond had seen a specialist and taken medication just before her arrest, that she was stable, and that she would be able to function without medication until her follow-up appointment. Notably, Myftari undermined his own reasoning when he also testified that if medications such as Richmond's were stopped, an inmate may begin experiencing symptoms, such as depression, mood oscillations, racing thoughts, restlessness, and pressured speech within ten days to two weeks. Richmond went seventeen days without medication before she even saw a psychiatrist, let alone received medication for her psychiatric needs.

As discussed above, an inmate has a right to be free from deliberate indifference to his or her serious psychological needs. *Comstock*, 273 F.3d at 702-03. The district court found that Richmond failed to present evidence that she suffered from a serious psychological need. However, for reasons discussed above, Richmond's psychiatric needs were sufficiently serious to give rise to an Eighth Amendment violation. Richmond showed that at the time of her incarceration, she had been diagnosed with mental illness by a physician who determined that such illness required treatment in the form of medication. Further, the Jail's own psychiatrist diagnosed Richmond with mental illness requiring treatment in the form of medication. As Richmond has shown that she was suffering from mental illness "that ha[d] been diagnosed by a physician as mandating treatment," she has shown that she was suffering from a serious medical need. *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 897.

Further, Myftari's own testimony regarding the symptoms felt by a person without access to their psychiatric medication belies the district court's conclusion. He testified that in the case of patients with depression or bipolar disorder, they can expect the symptoms to return within ten days to two weeks without access to medication. Yet, he scheduled Richmond's appointment with Dr. Hinchman—which was the earliest day she could have received any psychiatric medication—for seventeen days after her confinement began. Further, there is evidence in the record supporting Richmond's claim that she did not actually receive any psychiatric medication until the prescription ordered by Dr. Hinchman was filled, an additional three days after her appointment. Thus, there is evidence in the record to suggest that Myftari knew or had reason to know that Richmond had serious psychiatric needs that required treatment; that there was a risk that she would begin experiencing symptoms of depression and bipolar disorder days before she could expect to receive any medication to treat those ailments; and that he disregarded that risk by failing to ensure that Richmond would receive psychiatric medication in a timely manner. This showing is sufficient to create a genuine issue of fact as to Richmond's claim of deliberate indifference by Myftari and thereby to survive summary judgment. *Farmer*, 511 U.S. at 837.

The Defendants' argument that, should the need have arisen, Richmond could have been admitted to the Mental Health Inpatient Program and received medication immediately, is unavailing. To wait until an inmate with a documented history of mental illness has a psychiatric

episode so severe that it requires inpatient treatment before providing her with any psychiatric medication will inevitably result in unnecessary suffering by the inmate. This is the very type suffering the Eighth Amendment aims to prevent. Thus, the district court improperly granted summary judgment in favor of Mr. Myftari on this issue.

## D. Patricia Rucker

Patricia Rucker also served as a psychiatric social worker for the Wayne County Jail. Like Mr. Myftari, Ms. Rucker was not authorized to prescribe psychiatric medication. She saw Richmond on January 7, 2013 at Richmond's behest, because Richmond had not yet received psychiatric medication after being in the custody of the Jail for almost two weeks. After examining Richmond, Rucker sent her to a mental health screening under the mistaken assumption that Richmond had not yet been screened. Despite the fact that Rucker did not review Richmond's chart or otherwise attempt to verify Richmond's claims that she had been on prescription medication prior to entering the jail's custody, Rucker responded reasonably. Officials do not act with deliberate indifference when they "cho[o]se one medically reasonable form of treatment over another." *Comstock*, 273 F.3d at 710 (discussing *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1993) (en banc)). Rucker reacted to Richmond's claim that she required psychiatric medication by referring Richmond for a mental health evaluation. This constitutes a "medically reasonable" response, even though Rucker did not personally make an effort to verify or secure Richmond's medications. *See Rouster v. Cnty of Saginaw*, 749 F.3d 437, 449 (6th Cir. 2014) (holding that a doctor took "appropriate steps to protect" an inmate where she relied on other jail staff to evaluate an inmate's condition). As such, summary judgment on Richmond's claims against Rucker was appropriate.

## E. Jail Nursing Staff

The majority of the interactions between Richmond and the Jail medical staff involved members of the nursing staff who were responsible for Richmond's initial screenings as well as the implementation of the doctors' prescribed plan of treatment. Richmond alleges that the nursing staff failed to provide her with the pain medication and dressing changes ordered by the Jail physicians. She also argues that the nursing staff is complicit in the failure to provide

psychiatric medication in a timely manner. The Defendants counter by arguing that Richmond has failed to identify any individual who refused to provide any part of her prescribed treatment and that the nursing staff was not responsible for prescribing her psychiatric medication.

Seven different members of the nursing staff provided Richmond dressing changes at one point or another throughout her incarceration, Nurse Fowler, Nurse Hawk, Nurse Lonberger, Medical Assistant Allen, Nurse Shoulders, Nurse Wilson, and Nurse Burnett.[6] The latter two are not parties to this suit, so we discuss only the actions of the remaining five. Nurse Fowler last encountered Richmond on December 26, 2012, the day after her arrest. At that point, there is nothing in the record to suggest that Nurse Fowler knew or should have known of the risk that the treatment ordered by the doctor for Richmond would not be implemented as prescribed. As such, the district court properly dismissed Richmond's claim of deliberate indifference against Nurse Fowler, as it relates to the treatment of Richmond's burn wound.

Nurse Lonberger similarly did not treat Richmond after December 30, 2012, at which point Richmond's treatment had essentially been implemented as ordered. Thus, there is nothing in the record to suggest that Nurse Lonberger was or should have been aware of the risk that Richmond's treatment may not have been provided as prescribed at that point. However, unlike Richmond's claim against Fowler, Richmond specifically alleges that Nurse Lonberger otherwise violated her Eighth Amendment rights on one occasion when Nurse Lonberger intentionally scrubbed her wound so hard as to cause severe pain while cleaning it. One can assume that some pain may be expected while cleaning a wound such as this one, but there is a question of fact as to whether Nurse Lonberger's conduct was intentional to cause unnecessary pain to Richmond. While the Court in *Asplaugh* suggests that we should be hesitant to second guess Nurse Lonberger's medical judgment that some pain would be necessary, 643 F.3d at 169, Richmond alleges that Nurse Lonberger was intentionally causing her unnecessary pain, not simply that her method of cleaning may have constituted inadequate treatment. A reasonable jury could find that intentional scrubbing of a serious wound to cause a prisoner unnecessary pain could be characterized as "wanton infliction of unnecessary pain," in violation of the Eighth

---

[6]Medical Assistant Danielle Allen is included in this count even though she is not a nurse because these claims do not involve duties exclusive to nurses as compared to medical assistants.

Amendment. *See Estelle*, 429 U.S. at 104 ("The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency . . . ."). Summary judgment is thus inappropriate as to Richmond's deliberate indifference claim against Nurse Lonberger, given the factual dispute that remains.

The district court properly dismissed the claims against Nurse Williams and Nurse Coleman. Nurse Williams only interacted with Richmond as a triage nurse prior to Richmond's visit with Nurse Shoulders and Dr. Clafton. Nurse Williams would not have cleaned and changed Richmond's burn wound only for that dressing to be removed and the wound to be examined during the subsequent visit with the doctor. Nurse Coleman only saw Richmond on January 29, 2013, after Richmond received supplies to self-clean her wound. Further, Nurse Coleman only served in an administrative role and would not have cleaned and dressed a wound prior to Richmond's visit with Nurse Shoulders. The record simply does not support a finding that either Nurse Williams or Nurse Coleman disregarded a risk to Richmond's health. Rather, they both acted within their limited role of preparing Richmond for her scheduled examinations with the responsible medical party.

However, by the time Nurses Hawk and Shoulders had their last interactions with Richmond, there was evidence from the record to support a claim that they were aware that Richmond's treatment was not being implemented as prescribed. Nurse Hawk changed Richmond's dressing on December 27 and 31, 2012, as well as January 1, 2, and 4, 2013. Richmond did not have her dressing changed on January 3, 2013, because she had a court appearance at the time Nurse Hawk attempted to change her dressing. However, there is no indication in the record that Nurse Hawk attempted to change Richmond's dressing at a later time or attempted to notify any nurses on the next shift regarding the missed dressing change. In addition, Richmond's chart at the time indicated that she had not had a dressing change on December 28[7] or 29, 2012. From this, a reasonable jury could find that Nurse Hawk knew that daily dressing changes were prescribed and were important to Richmond's healing process, but that they were not being implemented as ordered. A reasonable jury could also conclude that

---

[7]Dr. Huq testified that she changed Richmond's dressing during her visit the day of the 28th, but this is not reflected on Richmond's chart or anywhere else in the record.

Nurse Hawk, knowing all of this, nevertheless disregarded the risk that Richmond's burn would not heal properly when she failed to ensure that Richmond's dressing was changed on January 3. At that point, Richmond had already started to complain about the Jail's failure to treat her as prescribed. By the time Nurse Shoulders saw Richmond for the first time, Richmond's medical records showed that the Jail medical staff had failed to change her dressing on six different occasions. Further, there is some dispute over whether Richmond's dressing was changed the day she saw Nurse Shoulders on January 11. Nurse Shoulders testified that she changed Richmond's dressing herself. However, Richmond disputes this and there is no notation in the record reflecting a dressing change on that day. In either case, there is evidence in the record from which a jury could find that, like Nurse Hawk, Nurse Shoulders consciously disregarded a serious risk that Richmond's plan of treatment would not be implemented as prescribed, which is enough to defeat summary judgment on this claim.

The grant of summary judgment in favor of Medical Assistant Allen was inappropriate as a genuine issue of material fact exists. Allen changed Richmond's dressing on January 5, 7, 9, 16, 20, and 21, 2013. There is no reason given for the staff's failure to change Richmond's dressing on January 6, 8, 13, 14, 15, 17, or 18. There is no evidence in the record that Allen, who changed Richmond's dressing most frequently during this two-and-a-half week period, made any attempt to address the inconsistent treatment. In fact on January 10, even though Richmond had not received a dressing change on January 6 or 8, Allen did not provide a dressing change for Richmond because Richmond was in court during Allen's shift. There is nothing in the record to suggest that Allen attempted to provide a dressing change before or after Richmond's court appearance or that Allen attempted to contact the next shift of nurses or medical assistants to let them know that Richmond would be in need of a dressing change after returning from court. And again, Richmond had started complaining of and documenting problematic medical treatment by January 7, right around the time Allen took over the prescribed dressing changes. From this record, a reasonable jury could find that Allen was aware of that Richmond was suffering from a serious medical need, requiring treatment in the form of daily dressing changes, that she was aware of the risk that Richmond faced in not receiving daily dressing changes, and that she disregarded that risk on multiple occasions.

Additionally, Richmond alleges that Nurses Fowler, Hawk, and Shoulders were deliberately indifferent to Richmond's serious psychiatric needs by failing to provide her with her psychiatric medication in a timely manner. Specifically, she alleges that these nurses were aware of her history of mental illness and yet made no effort to verify her existing medications with either her outside doctor or an outside pharmacy. Nurse Fowler examined Richmond on the day she was brought into the Jail. During this examination, Richmond informed Nurse Fowler that she had been taking Prozac and Xanax, that her last dosage was December 25, 2012, and that she was being treated by Team Mental Health. Although Nurse Fowler did recommend that Richmond be seen by a psychiatric social worker, the record does not show any attempt to verify Richmond's statement, either by contacting the prescribing pharmacy or by contacting Team Mental Health. Nurse Fowler defends this failure by explaining that Richmond was admitted late at night, at which point her pharmacy and doctor's office would have been closed. However, Nurse Fowler did not attempt to verify Richmond's prescriptions at a later date and left no notation requesting that a nurse on a subsequent shift perform this verification. Nor is there any indication that Nurse Fowler attempted to leave such instructions by another method.

Nurse Hawk also had extensive interactions with Richmond between December 27, 2012 and January 4, 2013. There is a question of fact as to whether Nurse Hawk ever reviewed Richmond's chart for the purpose of ascertaining her medical history or whether she was otherwise aware of Nurse Fowler's notation regarding Richmond's prior prescription history. There is no evidence that Nurse Hawk ever attempted to verify Richmond's claims, nor that she requested that another nurse attempt to do so. On this record, a reasonable jury could find that Nurses Fowler and Hawk were aware of Richmond's serious psychiatric needs and disregarded the risk that she may needlessly suffer by going without her psychiatric medication when they decided not to verify her claims with an outside pharmacist or doctor's office, actions that were "less than [their] training indicated was necessary." *See Comstock*, 273 F.3d at 706. Thus, summary judgment on the claims against Nurses Fowler and Hawk relating to Richmond's psychiatric treatment is not appropriate as there are genuine issues of material fact.

However, the same cannot be said for Nurse Shoulders. She first interacted with Richmond on January 11, the day of Richmond's appointment with Dr. Hinchman. For the reasons

discussed relating to Richmond's claims against Dr. Clafton for deliberate indifference to her serious psychiatric needs,**8** the district court properly granted summary judgment in favor of Nurse Shoulders regarding Richmond's claims of deliberate indifference to her serious psychiatric needs.

III.

Because we hold that summary judgment in favor of Defendants was improper at least against certain defendants, we must also address the issue of qualified immunity.**9**  The doctrine of qualified immunity shields officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity analysis has two steps: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

First, we must ask "whether the plaintiff has alleged facts which, when taken in the light most favorable to her, show that the defendant-official's conduct violated a constitutionally protected right." *Comstock*, 273 F.3d at 702.  This "collapses into the analysis of whether [Richmond] has produced sufficient evidence to show that [Defendants] were deliberately indifferent to [Richmond's] medical needs under the subjective component of the [deliberate-indifference] standard." *See Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012).  Because we have already concluded that a jury could find this to be the case with certain claims and certain defendants, the only remaining question is whether the right was clearly established.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock*, 273 F.3d at 702 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  However, we need

---

**8***See supra* Part II.A.

**9**The district court declined to address the issue of qualified immunity based on its finding that Richmond failed to show deliberate indifference.

not "find a case in which 'the very action in question has previously been held unlawful,' but rather, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Id*. (alterations and citation omitted). "The proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* in 1976." *Parsons*, 491 F. App'x at 602. This certainly includes the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105. It is also well-established that right of a prisoner to be free from deliberate indifference extends to psychological needs. *Comstock*, 273 F.3d at 702. Further, as noted above, this Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844–45 (6th Cir. 2002); *Comstock*, 273 F.3d at 702; *Boretti*, 930 F.3d at 1154. Thus, it was clearly established at the time of Richmond's incarceration in Wayne County Jail that neglecting to provide a prisoner with needed medication, intentionally scrubbing her wound to cause unnecessary pain, and failing implement the prescribed plan of treatment could constitute a constitutional violation.

IV.

The district court granted summary judgment in favor of Wayne County on Richmond's municipal liability claims on the grounds that because Richmond failed to show that any individual defendant was deliberately indifferent to her medical needs, she could not establish liability on the part of Wayne County. However, because we have found that Richmond has presented issues of material fact regarding whether any individual defendant violated her Eighth Amendment rights, her municipal liability claim must be considered in greater detail. "A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (citation omitted). To make such a claim, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id*. (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Relevant to the case at issue, official municipal policy extends to "the acts of its policymaking officials[] and practices so persistent and widespread as to practically have the force of law." *Id*. "[L]iability can arise and deliberate indifference can be

shown by proof that the city or county 'knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it.'" *Blackmore*, 390 F.3d at 900 (quoting *Farmer*, 511 U.S. at 847).

Richmond claims that Wayne County is subject to municipal liability because the Jail relies on a practice or custom that violates inmates' Eighth Amendment rights. Specifically, she points to the practices of relying on a psychiatric social worker to determine whether an inmate needs immediate medication, not providing any medication for a period of weeks to certain patients that the psychiatric social worker admits suffer mental illness, and not verifying patients' outside medication before determining whether they need immediate treatment. Richmond points to the Jail medical staff's treatment of her, a single incident of arguably unconstitutional activity, and also provides proof that the activity "was [arguably] caused by an existing, unconstitutional municipal policy." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985). Both Myftari and Rucker testified that the policies Richmond challenges were, in fact, the practices of the Wayne County Jail. Although Defendants contend that this is not the case and that Myftari is not qualified to speak to the Jail's policies, this defense at best points to a question of fact on this issue. Because there exist material questions of fact as to whether the actions of the Jail medical staff violated Richmond's right to be free from deliberate indifference to her serious medical needs and whether such actions were a part of the practice or custom of the Jail, the district court's grant of summary judgment on this claim was improper.

V.

For the foregoing reasons, the district court's grants of summary judgment to Defendants Agron Myftari, Maxine Hawk, Jacqueline Lonberger, Danielle Allen, and Wayne County are **REVERSED**; the district court's grants of summary judgment to Defendants Rubab Huq, Thomas Clafton, Shevon Fowler, and Marie Shoulders are **REVERSED** in part and **AFFIRMED** in part; the district court's grants of summary judgment to Defendants Patricia Rucker, April Williams, and Felecia Coleman are **AFFIRMED**; and this action is **REMANDED** to the district court for further proceedings consistent with this opinion.