NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0350n.06

No. 21-5012

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LARRY BOWLES et al., | ) | |
| **Plaintiffs-Appellants,** | ) | **FILED** |
| | ) | Jul 19, 2021 |
| v. | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| BOURBON COUNTY, KENTUCKY, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| **Defendant,** | ) | COURT FOR THE |
| | ) | EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| ADVANCED CORRECTIONAL HEALTHCARE, | ) | |
| INC. et al., | ) | |
| **Defendants-Appellees.** | ) | **OPINION** |
| | ) | |

Before: SILER, MOORE, and DONALD, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge. On March 29, 2016, Shannon Bowles ("Bowles") died from a herniation of a cerebral mass after being detained at the Bourbon County Regional Detention Center ("the Jail"). For days before his death, Bowles complained of serious headaches, which medical staff attributed to a sinus infection and symptoms of drug withdrawal. Plaintiffs-Appellants Larry Bowles and Austin Bowles, Bowles's father, and son, respectively, and the co-administrators of his estate, on behalf of Bowles's minor children, sued under § 1983 for inadequate medical care. After discovery, the district court granted Defendants' motion for summary judgment because Plaintiffs failed to establish that Defendants were deliberately indifferent to Bowles's medical condition. For the following reasons, we **AFFIRM** the district

court's grant of summary judgment because Plaintiffs cannot even establish that Defendants were objectively unreasonable in responding to Bowles's medical condition.

## I. BACKGROUND

### A. Facts

On March 15, 2016, police arrested Bowles at a Speedway gas station for public intoxication due to suspected drug use, in violation of Ky. Rev. Stat. § 525.100, and transported him to the Jail. R. 63-2 (Uniform Citation) (Page ID #667). At the Jail, corrections officers recovered heroin on Bowles's person and cited him for possession of a controlled substance, in violation of Ky. Rev. Stat. § 525.050. R. 63-3 (Uniform Citation) (Page ID #668). Twelve days later, on March 27, Bowles was transported to a hospital where he soon became unresponsive and was intubated. Two days after that, on March 29, he died.

#### 1. March 15, 2016

When Bowles arrived at the Jail on March 15, 2016, Donna James, a registered nurse, examined Bowles. Noting that his pupils were 1mm and nonresponsive, that he was shaky, and that he admitted to using Klonopin, marijuana, cocaine, and methadone, she recommended that the Jail transport Bowles to the Bourbon Community Hospital emergency department for evaluation. R. 61-14 (03/15/16 Med. Progress Note) (Page ID #545). At the emergency department, Dr. Babatunde Sokan examined Bowles and determined that "there [was] no indication for emergent intervention or admission." R. 63-5 (Bourbon Cmty. Hosp. Med. R. at 3) (Page ID #672). Dr. Sokan, however, cautioned that jail officials should "MONITOR [Bowles] CLOSELY" and "RETURN [him] TO THE ED [Emergency Department] IF SYMPTOMATIC." *Id.*

Defendant Matthew Johnston, an advanced practice registered nurse ("APRN"), examined Bowles after he returned to the Jail. R. 63-6 (03/15/16 Johnston Med. Progress Note) (Page ID #676).[1] Bowles complained to Johnston that he had been experiencing nausea and diarrhea, and Johnston prescribed Vistaril and Bentyl.[2] *Id.*; R. 74-4 (Johnston Dep. at 21) (Page ID #1336). Johnston attributed Bowles's complaints to drug withdrawal. R. 74-4 (Johnston Dep. at 23) (Page ID #1338). Under "Patient Education," Johnston wrote: "Don't do drugs." R. 63-6 (03/15/16 Johnston Med. Progress Note) (Page ID #676).

Johnston is an employee of Defendant Advanced Correctional Healthcare, Inc. ("ACH"), R. 74-4 (Johnston Dep. at 6) (Page ID #1321), a private company with which the Jail contracts to provide medical care to inmates, R. 80-1 (ACH Agreement) (Page ID #2233–44). Johnston visited the Jail once per week on Tuesdays to provide on-site care but was available by phone for the remainder of the week. R. 74-4 (Johnston Dep. at 11, 16–17) (Page ID #1326, 1330–31). Johnston was the only APRN regularly assigned to the Jail. *Id.* at 12 (Page ID #1327). ACH neither assigned a medical doctor to the Jail nor maintained a collaborative agreement with a medical doctor. R. 74-3 (Cox-Lynn Dep. at 17) (Page ID #1235). If an inmate required medical treatment

---

[1]Plaintiffs note that Johnston's medical examination was incomplete. Pls.' Br. at 15; *see also* R. 74-2 (Boryca Dep. at 29–38) (Page ID #1157–66) (outlining omissions from the Medical Progress Note). Johnston failed to take all of Bowles's vital signs or check Bowles's pupils when the prior Medical Progress Note described his pupils as non-responsive. R. 63-6 (03/15/16 Johnston Medical Progress Note) (Page ID #676).

[2]Johnston states that he prescribes Vistaril to treat anxiety, nausea, and vomiting associated with drug withdrawal, and Bentyl for diarrhea and stomach cramping. R. 74-4 (Johnston Dep. at 18) (Page ID #1333).

when Johnston was not at the Jail, then the protocol was to transport them to the Bourbon Community Hospital. *Id.* at 76 (Page ID #1294).

### 2. March 16, 2016

On March 16, 2016, Bowles submitted his first Sick Call Request complaining of a headache and insomnia. R. 61-21 (03/16/16 Sick Call Request) (Page ID #572). Defendant Kelly Cox-Lynn, a Licensed Practical Nurse ("LPN"), examined Bowles the next day. When Bowles was detained at the Jail, ACH employed Cox-Lynn and another LPN to provide day-to-day medical care for inmates. R. 74-3 (Cox-Lynn Dep. at 16–17) (Page ID #1234–35). LPNs cannot diagnose or treat illnesses. *Id.* at 17 (Page ID #1235). Rather, "LPNs operate under the direction of a registered nurse, physician, physician assistant, [or] advanced practice registered nurse . . . ." R. 73-1 (Board of Nursing: LPN Scope of Practice at 3) (Page ID #1061).

Cox-Lynn documented that Bowles complained of head pain and sinus pressure. R. 61-22 (03/17/16 Progress Note) (Page ID #573). She assumed that Bowles had a sinus infection and called Johnston to obtain a prescription for an antibiotic and Tylenol. R. 74-3 (Cox-Lynn Dep. at 57–58) (Page ID #1275–76). The progress note included the phrase "notify NP." R. 61-22 (03/17/16 Progress Note) (Page ID #573).

Johnston visited the Jail on Tuesday, March 22. R. 74-3 (Cox-Lynn Dep. at 58–59) (Page ID #1276–77). Johnston reviewed and stamped the March 17 progress note. R. 61-22 (03/17/16 Progress Note) (Page ID #573) (stamp and date); R. 74-4 (Johnston Dep. at 59) (Page ID #1374). Despite knowing that Bowles was an IV drug user in drug withdrawal, was diagnosed with an infection, and had complained of nausea, diarrhea, and head pain, Cox-Lynn seemingly did not put Bowles on the list of patients for Johnston to see during his March 22, 2016 visit. R. 74-3

4

(Cox-Lynn Dep. at 14, 75–76) (Page ID #1232, 1293–94). Johnston, too, did not ask to see Bowles after reviewing the March 17 progress note. R. 74-4 (Johnston Dep. at 17, 45) (Page ID #1332, 1360) (stating that he did not see Bowles on March 22); R. 74-3 (Cox-Lynn Dep. at 26) (Page ID #1244) (explaining that Johnston would occasionally see patients not on the list that she prepared). Johnston was not expected to visit the Jail again until the next Tuesday, March 29. R. 74-3 (Cox-Lynn Dep. at 84) (Page ID #1302).

### 3. March 23, 2016

Between March 17 and March 23, Bowles did not submit any call requests. At 4:48 AM on March 23, corrections officers were called to Bowles's cell, where he was shaking and complained that he had a migraine headache and felt like he was going to pass out. R. 61-23 (03/23/16 Knipper Incident Rep.) (Page ID #574). Corrections officers receive training in first aid and CPR, but aside from that, they have no formal medical training. R. 76-2 (Gant Dep. at 93) (Page ID #1808). If an inmate presents with medical symptoms when an LPN or APRN is not at the Jail, ACH requires that the deputies follow a written protocol to determine whether to contact the APRN on call. R. 74-2 (Boryca Dep. at 17, 75) (Page ID #1145, 1203). Consistent with ACH's policy, Deputy Jailer Eric Knipper completed the Headache Protocol form and then determined that it was necessary to contact the APRN on call, Defendant Trena Preston. R. 61-24 (Headache Protocol) (Page ID #575).[3] Based on the incomplete information obtained by Knipper, Preston believed that the headache stemmed from Bowles's drug withdrawal or a sinus infection, R. 63-14

---

[3]Plaintiffs note that Knipper failed to take Bowles's vital signs, ask about his history of headaches, or check his pupils or ear canals as required by the Headache Protocol. R. 74-2 (Boryca Dep. at 41) (Page ID #1170); R. 75-1 (Wilcox Dep. at 61–62) (Page ID #1532–33).

5

(Preston Dep. at 51) (Page ID #832), and prescribed Tylenol and Vistaril, R. 61-24 (Headache Protocol) (Page ID #575). Preston stated in her deposition that Knipper had not told her that Bowles was reporting that he was having a migraine and that he felt like he was going to pass out, and if so, Preston would have asked the corrections officer to perform additional tests. R. 63-14 (Preston Dep. at 16–17) (Page ID #823).

At 10:00 AM on March 23, Cox-Lynn saw Bowles. Bowles complained that he was still experiencing a headache, neck pain, and sinus pressure, and was now experiencing nausea and vomiting. R. 74-3 (Cox-Lynn Dep. at 61) (Page ID #1279); R. 61-26 (03/23/16 Progress Report) (Page ID #585). Cox-Lynn contacted Preston by phone,[4] and Preston ordered Dilotab.[5] R. 61-26 (03/23/16 Progress Report); R. 63-14 (Preston Dep. at 23–24) (Page ID #825). Preston maintains that Cox-Lynn did not inform her that Bowles was now also reporting vomiting (and perhaps nausea), which she would have viewed as a "deterioration in [Bowles's] condition." R. 63-14 (Preston Dep. at 22–23) (Page ID #825). Based on the information that Cox-Lynn provided, however, Preston believed that Bowles's headache was a result of a sinus infection. *Id.* at 23 (Page ID #825).

Bowles did not submit a sick call request on March 24 or March 25. On March 26, 2016, Bowles submitted a sick call request, which listed "migraine headaches really bad leg cramps and

---

[4]Preston states that Cox-Lynn contacted her instead of Johnston because Cox-Lynn had been unable to reach him. R. 63-14 (Preston Dep. at 31) (Page ID #827).

[5]Dilotab is a combination of Tylenol and Pseudoephedrine used to relieve sinus congestion. R. 63-14 (Preston Dep. at 23) (Page ID #825).

not sleeping." R. 61-27 (03/26/16 Sick Call Request) (Page ID #586).  Cox-Lynn did not review the sick call request prior to when Bowles went to the hospital.[6]

### 4.  March 27, 2016

On March 27, 2016, while Cox-Lynn was passing out medications, Bowles reported sinus pressure, a headache, and nausea and vomiting.  R. 63-18 (03/27/16 Medical Progress Note) (Page ID #847).

That afternoon, Deputy Jailer Harry Laytart and Jailer Brittany Sidney responded to a radio call that Bowles needed help.  R. 61-29 (03/27/16 Sidney Incident Rep.) (Page ID #588); R. 61-30 (03/27/16 Laytart Incident Rep.) (Page ID #589); R. 76-5 (Laytart Dep. at 40–44) (Page ID #2023–27).  When they arrived at Bowles's cell, Bowles asked to see medical because he was experiencing a migraine headache and dizziness.  R. 61-30 (03/27/16 Laytart Incident Rep.) (Page ID #589).  They took Bowles to see Cox-Lynn, who took Bowles's vital signs and asked about his symptoms.  *Id.*  Bowles told Cox-Lynn that his head was hurting and that he needed pain medication.  *Id.*  She explained that she would contact the APRN on call to determine the course of treatment, but in the meantime, he should return to his cell, lie down, put a cold washcloth over his face, and try to relax.  *Id.*  They returned Bowles to his cell around 1:43 PM.  *Id.*

At 2:31 PM, shortly after Cox-Lynn had sent Bowles back to his cell, Deputies Justin Hughes and Amie Kearns responded to a call by radio that Bowles was in distress.  R. 61-33

---

[6]At the bottom of Bowles's final sick call request, another person added a note that Bowles had been taken to the hospital on March 27, their signature, and the date March 28, 2016.  R. 61-27 (03/26/16 Sick Call Request) (Page ID #586).  During her deposition, Cox-Lynn stated that she did not recognize the signature or the handwriting on the sick call request.  R. 74-3 (Cox-Lynn Dep. at 73) (Page ID #1291).  She stated that it was her practice to sign the sick call request and the progress note at the same time.  *Id.* at 74 (Page ID #1292).

(Kearns Incident Rep.) (Page ID #600); R. 61-34 (Hughes Incident Rep.) (Page ID #601).  Bowles had passed out in the bathroom and was complaining of extreme pain in his head and neck area. R. 61-34 (Hughes Incident Rep.) (Page ID #601).  Cox-Lynn, upon learning of Bowles's deterioration, contacted Preston, who recommended that the Jail send Bowles to the hospital.  R. 61-32 (03/27/16 Med. Progress Note) (Page ID #599).[7]  Kearns noted that Bowles stated that his eyes hurt and that it was hard to see, and that he vomited twice before leaving for the hospital.  R. 61-33 (Kearns Incident Rep.) (Page ID #600).

At the Bourbon Community Hospital, Bowles underwent a computerized tomography ("CT") scan, which revealed a large, right temporal lobe mass with no herniation in his brain.  R. 61-38 (Radiology Rep.) (Page ID #615).  The radiology report stated that the mass was "most consistent with a high-grade primary malignancy, likely astrocytoma."  *Id.*  While in a hospital room, Hughes, who was responsible for monitoring Bowles at the hospital, noticed that Bowles "lean[ed] over and looked like he went to sleep."  R. 61-34 (Hughes Incident Rep.) (Page ID #601). A paramedic attempted to wake Bowles, but he was unresponsive.  *Id.*  Doctors intubated Bowles and transferred him by air ambulance to the University of Kentucky Medical Center.  *Id.*; R. 61-39 (MDM) (Page ID #616–18).[8]  Bowles was determined to be brain dead, R. 61-44 (Brain Death

---

[7]Preston stated during her deposition that Cox-Lynn had told her that Bowles's pupils were dilated and that he was experiencing shaking or tremors, which led her to suspect neurological involvement.  R. 63-14 (Preston Dep. at 18–19) (Page ID #829).  According to Preston, the length of the headache and the potential neurological involvement led her to recommend sending Bowles to the hospital.  *Id.*  Cox-Lynn's Medical Progress Note, however, states that Preston recommended sending Bowles to the hospital for fluids and shots to treat his migraine.  R. 61-32 (03/27/16 Med. Progress Note) (Page ID #599).

[8]Sometime on March 27, 2016, the Jail procured Bowles's release through a released on recognizance ("ROR") bond.  R. 61-42 (Judge Phelps Memo) (Page ID #624).  As a result,

Testing) (Page ID #626), and his family approved the withdrawal of care, R. 61-44 (Autopsy Rep. at 2) (Page ID #628). The attending physician listed his time of death as 9:29 AM on March 29, 2016. R. 61-43 (Discharge Summ.) (Page ID #625).

The University of Kentucky Department of Pathology and Laboratory Medicine performed an autopsy and determined that Bowles had a "large, cavitary, right temporal abscess" not a brain tumor. R. 61-44 (Autopsy Rep. at 1) (Page ID #627). The coroner, after reviewing Bowles's medical records and performing an external body exam of Bowles, determined that the cause of death was a "Right Temproparietal Mass due to Chronic IV Drug Abuse." R. 61-45 (Coroner's Rep.) (Page ID #632).

## B. Procedural History

On October 31, 2017, Plaintiffs filed a complaint against Defendants ACH and its employees, Johnston, Preston, and Cox-Lynn, and Bourbon County and its employees at the Jail, Gary Wilson, Sheila Gant, Laytart, Kearns, Hughes, Sidney, and Sonja French.[9] R. 1 (Compl.) (Page ID #1–13). After Bourbon County filed a motion to dismiss explaining that the Bourbon/Nicholas Regional Jail Authority ("the Jail Authority") manages the Jail, R. 9-1 (Mem. in Supp. of Mot. to Dismiss) (Page ID #92–93), Plaintiffs filed a First Amended Complaint, adding

---

Bowles's family is allegedly responsible for paying his medical bills. R. 1 (Compl. ¶ 26) (Page ID #10).

[9]Gary Wilson was the Jail's Administrator, and Sheila Gant was the Jail's Chief Deputy. R. 1 (Compl. ¶ 5) (Page ID #3). The Complaint alleges that Sonja French was listed as a member of the Jail's staff involved in an incident on March 27, but Plaintiffs were unable to provide details. *Id.* ¶ 21 (Page ID #8).

the Jail Authority and Nicholas County, Kentucky as Defendants, R. 14 (First Am. Compl.) (Page ID #144–56).

Count one of the First Amended Complaint alleges that "Mr. Bowles, through Defendants' deliberate indifference and negligent and grossly negligent -- if not reckless, intentional and/or malicious -- conduct, was subjected to cruel and unusual punishment and ultimately deprived of his life without due process of law in violation of the Eighth, Tenth and Fourteenth Amendments of the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983." *Id.* ¶ 31 (Page ID #153–54). Plaintiffs also raised various state-law claims. *Id.* ¶ 32–35 (Page ID #154). After discovery, Defendants filed motions for summary judgment. R. 61 (The Jail Authority Mot. for Summ. J.) (Page ID #424–25); R. 62 (Hughes Mot. for Summ. J.) (Page ID #634–36); R. 63 (ACH Mot. for Summ. J.) (Page ID #638–40).[10]

As part of the response to the motions for summary judgment, Plaintiffs argued that the district court should apply the objective-unreasonableness test from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to the claim of constitutionally inadequate medical care, not the subjective deliberate-indifference test. R. 73 (Resp. to ACH Mot. for Summ. J. at 14–18) (Page ID #1045–49). In *Kingsley*, the Supreme Court held that a pretrial detainee alleging excessive force was required to establish "only that the force purposely or knowingly used against him was objectively unreasonable." 576 U.S. at 396–97. Plaintiffs argued that this less onerous, objective test should

---

[10]Plaintiffs settled their claims against the Defendants Bourbon County, Kentucky, Nicholas County, Kentucky, the Bourbon/Nicholas Regional Jail Authority, and employees of the Jail. R. 88 (Order Approving Settlement) (Page ID #2339–40).

extend to claims of constitutionally inadequate medical care, and cited cases from other circuits applying the test. R. 73 (Resp. to ACH Mot. for Summ. at J. at 15) (Page ID #1046).

The crux of Plaintiffs' claim of constitutionally inadequate medical care is that, although Bowles did not die from drug withdrawal, close attention to Bowles's potential symptoms of drug withdrawal and use of a drug withdrawal flow sheet, *see* R. 73-4 (Detox Flow Sheet) (Page ID #1073), would have led to the Jail bringing Bowles back to the hospital. At the hospital, a medical provider capable of diagnosing Bowles could have performed tests to diagnose Bowles's persistent symptoms. Plaintiffs allege that this failure is especially egregious because the hospital was located 0.6 miles from the Jail, and the March 15, 2016 hospital discharge instructions instructed him to return to the hospital if his symptoms worsened. R. 73 (Resp. to ACH Mot. for Summ. at J. at 18–19) (Page ID #1049–50). Plaintiffs and their medical expert argue that if Defendants had sent Bowles to the hospital when he first started experiencing symptoms on March 23 (and perhaps on March 27 when Cox-Lynn first examined him), then he might have survived. R. 73 (Resp. to ACH Mot. for Summ. at J. at 23) (Page ID #1054); R. 47-3 (Pfalzgraf Rep. at 1) ("Had he been taken to the hospital before this critical moment, such as on 3/23/16 when he was seen by jail personnel, he would have had treatment to prevent herniation until his mass could be definitively treated.").

Plaintiffs first fault ACH for implementing no policies or protocols to guide their employees in caring for inmates' medical conditions and drug withdrawal. R. 73 (Resp. to ACH Mot. for Summ. at J. at 18) (Page ID #1049). Defendants failed to use a flow sheet to closely monitor Bowles, as requested by the Hospital, or to follow ACH's opioid-withdrawal protocol. Specifically, Johnston failed to use a flow sheet to monitor Bowles closely as required by the

11

Hospital's discharge instructions, even though Plaintiffs' expert stated that a flow sheet was standard of care. *Id.* at 20 (Page ID #1051). Plaintiffs also argue that Johnston erred by failing to examine Bowles personally on March 22 when Johnston actually was at the jail, even though Bowles was experiencing persistent symptoms of withdrawal. *Id.* at 20–21 (Page ID #1051–52). Plaintiffs allege that Preston violated the standard of care by relying on incomplete information from Cox-Lynn and a deputy jailer to diagnose Bowles and make treatment decisions. *Id.* at 21 (Page ID #1052). In treating Bowles, Preston failed to ask questions about Bowles's condition or monitor Bowles to determine whether her proposed treatment was working. *Id.* Preston also failed to start a flowsheet for Bowles, even thought it was her practice to start a flow sheet for every inmate withdrawing from drugs. *Id.* Specific to Cox-Lynn, Plaintiffs argue that Cox-Lynn failed to implement the hospital's request to closely monitor Bowles, declined to include Bowles on the list of patients to be examined by Johnston on March 22, and failed to inform Preston on March 23 that Bowles was experiencing nausea and vomiting, which Preston maintains would have signaled a more serious problem. *Id.* at 21–22 (Page ID #1052–53). Further, Plaintiffs note that Cox-Lynn delayed Bowles's transport to the Hospital for two critical hours on March 27. *Id.* at 22 (Page ID #1053).

The district court granted Defendants' motion for summary judgment on Plaintiffs' constitutional claims.[11] R. 90 (11/30/20 Op. & Order) (Page ID #2345–64). Applying the subjective deliberate-indifference test, the district court determined that ACH and its employees'

---

[11]In an amended order, the district court clarified that it dismissed Plaintiffs' state-law claims without prejudice. R. 95 (12/15/20 Order) (Page ID #2492–93); R. 96 (Am. J.) (Page ID #2494).

conduct did not amount to a conscious disregard of Bowles's serious medical condition. *Id.* at 2 (Page ID #2346). Plaintiffs timely appealed. R. 97 (Not. of Appeal) (Page ID #2495). The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and this court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  ANALYSIS

Plaintiffs admit that they cannot satisfy the deliberate-indifference test under the Eighth Amendment and do not press this argument on appeal. Pls.' Reply Br. at 4. Instead, Plaintiffs contend that *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), requires that the district court apply an objective-unreasonableness test to Plaintiffs' claim of constitutionally inadequate medical care. Defendants counter that the objective-unreasonableness test articulated in *Kingsley* is limited to claims of excessive force and should not extend to claims of constitutionally inadequate medical care. Moreover, Defendants contend that Plaintiffs' claims do not satisfy even the objective-unreasonableness standard. We need not resolve the proper standard after *Kingsley* to evaluate claims of constitutionally inadequate medical care made by pretrial detainees, for the record shows that Plaintiffs cannot satisfy their preferred objective-unreasonableness standard.

### A.  Standard of Review

"We review a district court's grant of summary judgment de novo." *Brown v. Chapman*, 814 F.3d 447, 464 (6th Cir. 2016). We affirm the grant of summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether there is a 'genuine issue for trial,' we interpret the facts and draw all reasonable inferences therefrom in favor of the nonmoving party. *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (citation omitted).

13

**B. A Pretrial Detainee's Right to Medical Care**

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court recognized that the Eighth Amendment's prohibition of cruel and unusual punishment obligated prison officials to provide medical treatment for incarcerated persons. The Court reasoned that since the Eighth Amendment prohibited the "unnecessary and wanton infliction of pain," "deliberate indifference to serious medical needs of prisoners" would run afoul of that proscription. *Id.* at 104.

When determining whether the medical care provided to a prisoner rises to the level of a constitutional violation under the Eighth Amendment, we apply a two-part test. The first part is objective and requires that the plaintiff establish "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The second subjective component requires that "an inmate . . . show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). To meet this standard, "a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Id.* (citing *Farmer*, 511 U.S. at 837). The Supreme Court has explained that the requirement that a plaintiff "establish that [defendants] possessed a sufficiently culpable state of mind" reflects that "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle*, 429 U.S. at 104).

We apply a version of this two-part test to prisoners' claims alleging a failure to prevent harm, *Woods v. Lecureux*, 110 F.3d 1215, 1222–23 (6th Cir. 1997), prisoners' challenges to the conditions of confinement, *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 352 (6th Cir. 2001), and

14

prisoners' claims of excessive force, *Cordell v. McKinney*, 759 F.3d 573, 580–81 (6th Cir. 2014). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 401 (6th Cir. 1999) (en banc) ("All Eighth Amendment claims have an objective component, and when 'the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer' in order to make out the subjective component of an Eighth Amendment violation." (quoting *Wilson*, 501 U.S. at 300)).

Pretrial detainees, like Bowles, are not within the protection of the Eighth Amendment, and so we analyze their claims under the Fourteenth Amendment's Due Process Clause. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Despite the different constitutional underpinnings, we have "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

With *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), an excessive-force case, the Supreme Court rejected the practice of analyzing claims by prisoners and pretrial detainees under the same standard. In *Kingsley*, the Supreme Court concluded that pretrial detainees alleging excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. The Court cautioned that "as we have stated, 'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.'" *Id.* at 396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (emphasis added)). In adopting a different standard for pretrial detainees than that for prisoners, the Court emphasized that "[t]he language of the two [the Eighth Amendment's Cruel and Unusual Punishment Clause

and the Fourteenth Amendment's Due Process Clause] differs, . . . the nature of the claims often differs[,] [a]nd, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* at 400–01 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–72, n.40 (1977)). *Kingsley*, however, did not explicitly decide whether the objective-unreasonableness standard applied to all § 1983 claims made by pretrial detainees.

As a circuit, we have not squarely resolved whether the objective-unreasonableness test of *Kingsley* extends to claims by pretrial detainees of constitutionally inadequate medical care. In *Richmond*, we "recognize[d] that this shift in Fourteenth Amendment deliberate indifference jurisprudence" as a result of *Kingsley* "calls into serious doubt whether [the pretrial detainee] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them." 885 F.3d at 938 n.3. Nonetheless, we did not decide whether *Kingsley* altered the standard for claims of constitutionally inadequate medical care because "neither party cite[d] *Kingsley* or addresse[d] its potential effect in their briefing." *Id.*

In subsequent cases, we have "stayed out of the fray," and "found it unnecessary to answer the question each time we have confronted the issue" because the "same result would obtain under either the subjective test dictated by *Farmer* or by a purely objective test derived from *Kingsley*." *Griffith v. Franklin County*, 975 F.3d 554, 570 (6th Cir. 2020); *see also Martin v. Warren County*, 799 F. App'x 329, 337 n.4 (6th Cir. 2020) (declining to consider whether *Kingsley* requires that the objective-unreasonableness test extend to a pretrial detainee's claim of inadequate medical care because the plaintiff "at best shows negligent conduct"); *Roberts v. Coffee County*, 826 F. App'x 549, 551 n.2 (6th Cir. 2020) (noting that "neither party discusses *Kingsley*'s potential effect on

16

[plaintiff's] deliberate-indifference claim" and, thus, declining to "address that issue here"); *Cameron v. Bouchard*, 815 F. App'x 978, 984–85 (6th Cir. 2020) (concluding that even under the objective-unreasonableness standard, pretrial detainees failed to establish that jail officials were more than negligent in responding to the risk of COVID-19). In a handful of cases, plaintiffs have neglected to mention that *Kingsley* might warrant an objective analysis only, and we have applied the subjective deliberate-indifference standard without reflection. *See, e.g.*, *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020); *Medley v. Shelby County*, 742 F. App'x 958, 961 (6th Cir. 2018).

Although we have not had occasion to resolve the proper standard for claims of constitutionally inadequate medical care brought by pretrial detainees after *Kingsley*, other circuits have considered the question and have come to different conclusions. On one side, a slim majority of circuits have limited *Kingsley* to excessive-force claims. In most cases where a circuit has declined to extend *Kingsley* to claims of constitutionally inadequate medical care, the court's analysis is sparse and confined to a footnote. *See, e.g.*, *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) ("<u>Kingsley</u> does not control because it was an excessive force case, not a deliberate indifference case."); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (recognizing that the Fifth Circuit continues "to apply a subjective standard post-*Kingsley*," but nevertheless, plaintiff's claim would fail under the objective-unreasonableness standard); *Dang ex rel. Dang v. Sheriff, Seminole County*, 871 F.3d 1272, 1279–80 n.2 (11th Cir. 2017) (concluding that *Kingsley* did not abrogate the circuit's precedent applying a subjective deliberate-indifference test to claims of constitutionally inadequate medical care because *Kingsley* involved an excessive-force claim and also that pretrial detainee did not even satisfy *Kingsley*).

*But see Strain v. Regalado*, 977 F.3d 984, 991–93 (10th Cir. 2020) (declining "to extend <u>Kingsley</u> to Fourteenth Amendment deliberate indifference claims" because "<u>Kingsley</u> turned on considerations unique to excessive force claims: whether the use of force amounted to punishment, not on the status of the detainee," "the nature of a deliberate indifference claim infers a subjective component," and "principles of *stare decisis* weigh against overruling precedent to extend a Supreme Court holding to a new context or new category of claims").[12]

The Second, Seventh, and Ninth Circuits, by contrast, have extended *Kingsley* to claims by pretrial detainees of constitutionally inadequate medical care. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (asserting that, "[f]ollowing the Supreme Court's analysis in <u>Kingsley</u>, there is no basis for the reasoning . . . that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment, as articulated in <u>Farmer</u>, must apply to deliberate indifference claims under the Fourteenth Amendment").

Regardless of whether we analyze Plaintiffs' claims under the objective-unreasonableness standard, as Plaintiffs here request, or under the more stringent subjective deliberate-indifference

---

[12]Defendants note that in *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64 (1st Cir. 2016), the First Circuit applied the objective-unreasonableness standard to plaintiff's excessive-force claim, but the subjective deliberate-indifference test to plaintiff's inadequate-medical-care claim. Defs.' Br. at 27. The plaintiffs in *Miranda-Rivera*, however, did not argue that the objective-unreasonableness standard should apply to their inadequate-medical-care claim (or even cite *Kingsley* in their briefs or in a Rule 28(j) letter). This oversight is understandable given that the Supreme Court issued *Kingsley* on June 22, 2015, and the parties in *Miranda-Rivera* completed briefing on July 5, 2015. Docket, *Miranda-Rivera v. Toledo-Dávila*, No. 14–1535 (1st Cir.). In another case, *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018), the First Circuit applied the subjective deliberate-indifference test to an inadequate-medical-care claim by a pretrial detainee under the "Eighth Amendment." Suffice it to say, the First Circuit's position on the proper standard for evaluating inadequate-medical-care claims by pretrial detainees is less than clear.

standard, Plaintiffs' claims fail because they cannot establish more than negligence by Defendants. Accordingly, we do not contribute to the circuit split on the relevant test.

## C. Sufficiently Serious Medical Condition

Plaintiffs first must establish that Bowles's medical concern was "sufficiently serious." *Farmer*, 511 U.S. at 834. We define a sufficiently serious medical need as "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

Here, the parties dispute whether Bowles experienced a sufficiently serious medical need. Defendants cite a district court case, *North v. County of Cuyahoga*, No. 1:15-CV-01124-DAP, 2017 WL 3479579, at *9 (N.D. Ohio Aug. 14, 2017), *aff'd sub nom. North v. Cuyahoga County*, 754 F. App'x 380 (6th Cir. 2018), in which the district court noted in passing that a headache— without more—was not a sufficiently serious medical condition. Defs.' Br. at 18. Bowles, however, suffered from a persistent migraine-like headache, vomiting, and nausea that ended with intubation and death. *See Blackmore*, 390 F.3d at 899 (recognizing that plaintiff showed obvious signs of serious physical illness when he "exhibited obvious manifestations of pain" and "vomited—a clear manifestation of internal physical disorder"). Accordingly, a jury could find that Bowles's medical needs were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Gaudreault*, 923 F.2d at 208).

## D. Objective Unreasonableness

Plaintiffs' remaining claims are against Defendants Johnston, Preston, Cox-Lynn, and ACH. We address each Defendant's conduct in turn.

**1. Tracy Cox-Lynn**

Plaintiffs list numerous ways in which Cox-Lynn's care was objectively unreasonable, including that she failed to take all vital signs during her examinations of Bowles, failed to monitor Bowles closely upon his return from the initial hospital visit, and failed to put Bowles on a list of patients to be examined by Preston on March 22. Pls.' Br. at 38. These shortcomings do not rise above negligence. LPN Cox-Lynn responded to Bowles's sick call requests and conveyed his subjective concerns to APRNs Preston and Johnston.

Cox-Lynn's liability becomes less clear as to her alleged failure to inform Preston on March 23 that Bowles reported nausea and vomiting along with a headache, and her delay in sending Bowles to the hospital on March 27. Cox-Lynn states that on March 23, Bowles complained that he was still experiencing a headache, neck pain, and sinus pressure, and was now experiencing nausea and vomiting. R. 74-3 (Cox-Lynn Dep. at 61) (Page ID #1279); R. 61-25 (03/23/16 Progress Report) (Page ID #585). By contrast, Preston stated her in deposition that Cox-Lynn did not inform Preston that Bowles was now also reporting vomiting (and perhaps nausea), which Preston would have viewed as a "deterioration in [Bowles's] condition. R. 63-14 (Preston Dep. at 22–23) (Page ID #825). Reviewing the facts in the light most favorable to the Plaintiffs, we assume that Cox-Lynn failed to inform Preston that Bowles was experiencing nausea and vomiting. As the Defendants note, however, Bowles submitted no sick call requests on March 24 and 25, and neither corrections officers nor the medical staff noticed anything amiss with Bowles until March 27.

The two-hour delay refers to Cox-Lynn's failure to send Bowles to the hospital at 1:31 PM on March 27, rather than waiting for instruction from Preston. R. 61-30 (03/27/16 Laytart Incident

Rep.) (Page ID #589). After Bowles passed out at 2:31 PM, Cox-Lynn was able to contact Preston, who told her to send Bowles to the hospital. To emphasize the recklessness of Cox-Lynn's delay, Plaintiffs point to video from Bowles's cell showing Bowles in obvious pain, beating on his head with his fists, and throwing up in a bucket. Pls.' Br. at 26. Perhaps Cox-Lynn should have taken earlier action to elevate Bowles's condition to Preston or sent Bowles to the hospital before contacting Preston, but it was not more than negligent for Cox-Lynn to wait two hours for instruction from APRN Preston.

### 2. Matthew Johnston

Plaintiffs allege that Johnston "essentially abandoned Bowles" by failing to use a flow sheet to monitor Bowles and failing to examine Bowles on March 22 when Johnston arrived at the Jail for his weekly visit even though Cox-Lynn did not include Bowles on the list of patients that he should see. Pls.' Br. at 36. Any oversight by Johnston does not amount to more than common negligence. True, Plaintiffs' expert stated that utilizing a flow sheet is the standard of care for prisoners who are experiencing withdrawal, but Johnston prescribed medications to treat what he reasonably believed were symptoms of Bowles's withdrawal and instructed Bowles to follow up if needed. Accordingly, Plaintiffs' claims against Johnston fail under even the *Kingsley* objective-unreasonableness standard.

### 3. Trena Preston

Plaintiffs' claim against Preston centers on her response to calls made by a corrections officer and by Cox-Lynn to her on March 23. Pls.' Br. at 37–38. First, although "Preston had no knowledge of Bowles'[s] condition or medical history," "she made a diagnosis and treatment decision based on an untrained deputy's incomplete assessment." *Id.* at 37. Second, in response

21

to Cox-Lynn's call the morning of March 23, Preston did not order further testing, ask Cox-Lynn to check Bowles's pupils, or inquire as to whether the Jail had started a flow sheet to monitor Bowles's withdrawal symptoms or direct that the Jail start a flow sheet. *Id.*

Preston did not act with objective unreasonableness in responding to the correction officer's and Cox-Lynn's reports. In response to the corrections officer's call reporting that Bowles had a headache, felt like he was going to pass out, and was shaking because he was out of Vistaril, Preston ordered another dose of Vistaril and Tylenol, and requested that an LPN examine Bowles. In response to Cox-Lynn's call that Bowles had reported sinus pain, headache, and neck pain, she ordered Dilotab to address Bowles's misdiagnosed sinus complaints and provide pain relief. Further, when it became apparent on March 27 that Bowles's condition was more serious than a sinus infection, Preston ordered that the Jail transport Bowles to the hospital for evaluation.

### 4. Advanced Correctional Healthcare

Plaintiffs fail to demonstrate that a genuine dispute of material fact exists as to ACH's conduct. Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), an entity may be liable for "a policy or custom of failing to train and supervise its [employees]." *Shadrick v. Hopkins County*, 805 F.3d 724, 738 & n.6 (6th Cir. 2015). First, Plaintiffs argue that ACH was objectively unreasonable because it failed to provide written policies outlining how its employees should monitor drug withdrawal or should implement a hospital's discharge instructions. Pls.' Br. at 33–34. True, ACH did require that corrections officers follow certain protocols to respond to detainees' medical complaints when a health-care worker was not at the Jail, but Plaintiffs argue that these protocols were objectively unreasonable. Under ACH's protocols, "a medically-untrained deputy jailer was required to administer a headache protocol,"

and then "awaken an APRN who knew nothing about Bowles . . . to give her what information he had." Pls.' Br. at 35. Then, ACH's protocols required the "APRN to make an uninformed diagnostic and treatment decision based upon a[] medically-untrained deputy's incomplete assessment and report." *Id.* This extended protocol was objectively unreasonable, according to Plaintiffs, when "there was a Hospital virtually next door" to the Jail. *Id.* Accordingly, quoting *Shadrick*, 805 F.3d at 739, Plaintiffs maintain that "Bowles'[s] death was thus 'a highly predictable consequence of a failure to equip employees with specific tools to handle recurring situations.'" Pls.' Br. at 36.

Defendants first argue that Plaintiffs' claim against ACH fails because they cannot establish an underlying constitutional violation. In some cases, we have stated that if plaintiffs fail to establish any constitutional violation, then their *Monell* failure-to-train claim fails. *See, e.g.*, *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). In other cases, however, we have "explained that, in certain unusual circumstances, a municipality might be liable for a constitutional violation even in the absence of a liable individual." *Hart v. Hillsdale County*, 973 F.3d 627, 645 (6th Cir. 2020). For example, "it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Winkler v. Madison County*, 893 F.3d 877, 900 (6th Cir. 2018) (quoting *Epps v. Lauderdale County*, 45 F. App'x 332, 335 (6th Cir. 2002) (Cole, J., concurring)).[13]

---

[13]Defendants also argue that ACH is not liable because Bourbon County, not ACH, was responsible for drafting policies and procedures to guide the provision of healthcare within the

ACH could be liable under *Monell* if its policy failures resulted in constitutionally inadequate medical care. But here Plaintiffs have not met their burden of showing a genuine dispute of material fact that ACH's policy failures resulted in constitutionally inadequate medical care for Bowles as opposed to mere negligence.

In sum, Plaintiffs fail to establish more than negligence on the part of Defendants. Using *Kingsley*'s objective-unreasonableness standard, as requested by Plaintiffs, we conclude that Plaintiffs have not met their burden on summary judgment to show a genuine dispute of material fact that would allow their claims of constitutionally inadequate medical care to go forward.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment because Plaintiffs cannot establish even that Defendants were objectively unreasonable in treating Bowles's serious medical condition.

---

Jail. R. 80-1 (Agreement at 1.10) (Page ID #2235) ("ACH staff will operate within the requirements of the JAIL ADMINISTRATOR's policies, procedures, and protocols as communicated to ACH staff by the JAIL ADMINISTRATOR or designee. . . . Upon the JAIL ADMINISTRATOR'S request, ACH will assist the JAIL ADMINISTRATOR in drafting **medical** policies, procedures, and protocols."). Regardless of the terms of the contract, ACH is responsible for training its employees to ensure constitutionally adequate medical care.