RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JAMAL MURRAY,

*Plaintiff-Appellee*,

*v.*

STATE OF OHIO DEPARTMENT OF CORRECTIONS,

*Defendant*,

DR. TIMOTHY HEYD,

*Defendant-Appellant*.

> No. 21-3398

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:14-cv-00168—Timothy S. Black, District Judge.

Argued:  January 12, 2022

Decided and Filed:  March 30, 2022

Before:  GILMAN, KETHLEDGE, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Tracy L. Bradford, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Robert A. Klingler, ROBERT A. KLINGLER CO., L.P.A., Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Tracy L. Bradford, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Robert A. Klingler, ROBERT A. KLINGLER CO., L.P.A., Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Dr. Timothy Heyd served as the Chief Medical Officer of the prison where Jamal Murray was previously incarcerated and was also Murray's treating physician.  During his time in prison, Murray suffered from a condition known as deep-vein thrombosis, which, in Murray's case, involved the formation of venous blood clots in his legs.  Murray relied on the medication Coumadin to abate his condition.  After many weeks passed with inadequate monitoring and the prescribing of too low a dosage of Coumadin, Murray suffered from a cerebral blood clot that has left him permanently blind.

Murray timely brought an Eighth Amendment claim under 42 U.S.C. § 1983 against Dr. Heyd for deliberate indifference to Murray's serious medical needs.  Dr. Heyd sought qualified immunity in a motion for summary judgment, which the district court denied.  He now seeks a review of that ruling through the present interlocutory appeal.  For the reasons set forth below, we **AFFIRM** the district court's determination that Dr. Heyd is not entitled to qualified immunity as a matter of law.

**I.  BACKGROUND**

A.     **Factual background**

Dr. Heyd treated Murray while Murray was incarcerated at the Lebanon Correctional Institution in Warren County, Ohio.  Murray was incarcerated at that facility from October 2010 until May 2014.  As the facility's Chief Medical Officer, Dr. Heyd acknowledged in his declaration that he was "responsible for the day-to-day medical care of inmates" at Lebanon Correctional Institution and was "the ultimate medical authority at the prison institution."

Murray had a history of health issues that predated his incarceration.  He suffered from a heart attack in 2008 and from periodic episodes of deep-vein thrombosis in his legs.  Murray was hospitalized on December 31, 2010 at the Ohio State University Medical Center for his deep-vein thrombosis and was prescribed a treatment regimen of Coumadin (also known as Warfarin)

for long-term therapy. He was hospitalized multiple times during 2011 for his deep-vein thrombosis.

Murray's July 2011 medical records reveal that a hematology-consult team at the Ohio State University Medical Center recommended that Murray should have "a fair trial of Coumadin with an (INR) [international normalized ratio] ranging between 2.5 and 3." Coumadin is an anticoagulation drug that is designed to mitigate blood clots, and INR is a measure used to assess blood thinning. When administering Coumadin, medical professionals must conduct periodic blood tests to determine the INR level of the blood. A treating physician decides whether to adjust Coumadin dosages based on a patient's INR level.

Dr. Heyd treated Murray for the first time on November 16, 2011. Murray's INR level on that date was 2.3. Dr. Heyd reviewed a November 4, 2011 ultrasound of Murray's legs during this visit. According to Dr. Heyd's declaration, submitted in support of his motion for summary judgment, the ultrasound "revealed that [Murray's] previous [deep-vein thrombosis] had resolved. This showed that his anticoagulation therapy was progressing properly."

Dr. Heyd continued to treat Murray for the remainder of 2011. He monitored Murray's fluctuating INR levels during this time and adjusted Murray's Coumadin dosage accordingly. On November 21, 2011, Dr. Heyd prescribed 6.5 milligrams of Coumadin daily for Murray. Dr. Heyd ordered an INR test for Murray on November 30, 2011. On December 19, 2011, Dr. Heyd recommended that Murray refrain from taking Coumadin for two days. Dr. Heyd reinstated Murray's Coumadin regimen at a level of 5.5 milligrams on December 21, 2011 when Murray's INR tests from earlier in the month demonstrated excessively high INR levels. He ordered that a follow-up INR test be conducted within two weeks.

The record reflects that Murray had a blood draw on December 22, 2011. This blood draw showed that Murray's INR level was only 1.3 on that date. Although the blood-draw test bears a stamp showing that it was received by the Lebanon Correctional Institution's Deputy Warden of Special Services on December 23, 2011, Dr. Heyd contends that the blood draw did not occur.

On December 28, 2011, Dr. Heyd ordered that Murray have another INR test within 10 days. Murray purportedly failed to appear for his December 28, 2011 appointment with Dr. Heyd. "There was also no INR test done," according to Dr. Heyd's declaration. The declaration further asserts that Murray again failed to appear for his blood draw on January 18, 2012. Murray, however, stated in his declaration that he did not refuse or knowingly miss any blood draws while he was incarcerated.

On January 20, 2012, Murray reported to the nurse at sick call. He said that he had been experiencing headaches for four days and was struggling with coughing, a scratchy throat, and sinus drainage. The nurse gave Murray cold tablets, ibuprofen, and cough syrup.

Murray visited the nurse again on January 23, 2012, explaining that he had "started throwing up" and still had migraines. The nurse once more gave him cold tablets, ibuprofen, and cough syrup. This time the nurse referred Murray to see Dr. Heyd.

Murray reported to the nurse five days later, on January 28, 2012, apparently still not having been seen by Dr. Heyd. He complained of a headache and vomiting. The nurse again referred Murray to see Dr. Heyd and provided Murray with an allergy tablet for sinuses that can be used to treat migraines. During each of these visits, the attending nurses did not find that Murray presented with any neurological deficits.

Dr. Heyd finally examined Murray on January 31, 2012. Murray presented with fever and chills. Dr. Heyd administered an injection of Toradol to Murray and gave Murray Phenergan tablets, Zantac, and ibuprofen. The progress note written by Dr. Heyd from this visit states "PT/INR (overdue)."

On February 3, 2012, Murray complained to the nurse that he felt woozy and that one of his legs hurt. He assessed his pain as a 10 on a scale of 10. The nurse advised Murray to use meditation, relaxation, and over-the-counter medication to distract himself from the pain, and further noted that Murray was talking to another individual in the infirmary, seemingly without discomfort.

Murray suffered a stroke on February 6, 2012. He was sent to the emergency room due to shortness of breath and a headache. Once he was at the Ohio State University Medical Center, he was diagnosed with cerebral venous thrombosis, more commonly known as a cerebral blood clot. Murray's INR levels were registered at 1.6, 1.5, and 1.4 while he was hospitalized on February 6, 2012. Moreover, Murray's vision deteriorated after the stroke. Murray was again admitted to the hospital on September 13, 2012 for therapy by ophthalmologists and neurosurgeons to decompress his cerebral edema. He is now legally blind with bilateral loss of vision.

**B.       Procedural background**

Murray filed suit against several members of the Lebanon Correctional Institution's staff in March 2014. The complaint asserted a deliberate-indifference claim under the Eighth Amendment and an unlawful retaliation claim under the First Amendment. In August 2018, the defendants collectively filed a motion for summary judgment that sought to dismiss all of Murray's claims. They submitted declarations appended to their summary-judgment motion, including a declaration from Dr. Heyd.

Murray attached the expert report of Dr. Jack Goldberg, a hematologist, to his response in opposition to the motion for summary judgment. Dr. Goldberg's report reached the following conclusions: "Dr. Heyd and his staff of nurses allowed the INR to fall into subtherapeutic levels"; "Dr. Heyd failed to follow the hematology recommendations and failed to direct his nursing staff to appropriately adjust the Coumadin doses to achieve therapeutic INRs"; "Dr. Heyd failed to personally evaluate Mr. Murray when he was complaining of headaches and nausea[,] which were signs and symptoms of cerebral edema"; Murray's cerebral venous thrombosis "was directly caused by failure to maintain therapeutic INR levels"; and "[t]he thrombosis of his cerebral venous sinuses produced cerebral edema[,] which caused symptoms of severe headaches and caused papilla edema[,] which resulted in ocular blindness."

Murray also attached the expert report of Dr. Frederick Fraunfelder, whose report concluded that "it is more likely than not that Jamal Murray lost vision permanently in both his eyes due to cerebral venous thrombosis and resultant increased intracranial pressure."

Dr. Fraunfelder noted that "[i]ncreased intracranial pressure [is] a common complication from cerebral venous thrombosis [that] causes swelling around the optic nerve and cuts off blood flow to the retina.  This leads to loss of vision and blindness."

The magistrate judge issued a Report and Recommendation concerning the motion for summary judgment in February 2019.  She recommended that the district court deny the motion for summary judgment as to Murray's Eighth Amendment claim against Dr. Heyd, but grant the motion as to all of Murray's other claims against the remaining defendants.  The district court adopted the Report and Recommendation in its entirety in March 2021.  This interlocutory appeal by Dr. Heyd followed.

## II.  ANALYSIS

**A.      This court has jurisdiction over the district court's determination that Dr. Heyd is not entitled to qualified immunity as a matter of law**

The "general rule" that an order denying summary judgment is not immediately appealable under 28 U.S.C. § 1291 "does not apply when the summary judgment motion is based on a claim of qualified immunity." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014) (citation omitted).  "In considering the denial of a defendant's claim of qualified immunity, . . . our jurisdiction is limited to resolving pure questions of law." *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  We do not have jurisdiction to consider a district court's decision to deny summary judgment "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 370 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).  "[A] defendant seeking qualified immunity must be willing to concede the facts as alleged by the plaintiff and discuss only the legal issues raised by the case[,]" even if the defendant disputes the plaintiff's version of the facts. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002)).

Both parties expend a good portion of their briefs discussing factual arguments.  These are arguments that we cannot reach because they "drift[] from the purely legal into the factual realm and begin[] contesting what really happened[.]" *Moldowan*, 578 F.3d at 370 (quoting

*Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)).  We can, however, "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue" of whether the facts as proffered by Murray support a violation of clearly established law.  *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).  In the subsequent analysis, we ignore Dr. Heyd's contested issues of fact, accept Murray's proffered facts for the purpose of the analysis, and engage with the purely legal question of whether—based on those facts—Dr. Heyd is entitled to qualified immunity.

### B.        Standard of review

The fact that Dr. Heyd's motion for summary judgment was based on a claim of qualified immunity "does not affect the standard of review that applies."  *See Moldowan*, 578 F.3d at 374 (citation omitted).  "Whether a defendant is entitled to . . . qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*."  *Id.*  We must view the facts and reasonable factual inferences in the light most favorable to the nonmoving party, which, in this case, is Murray.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### C.        Whether Dr. Heyd is entitled to qualified immunity as a matter of law

We now consider the merits of the qualified-immunity defense.  Qualified immunity often shields government officials from liability arising from constitutional claims.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  The two prongs of the test require a plaintiff to show (1) "that government officials violated a constitutional right," and (2) "that the unconstitutionality of their conduct was clearly established when they acted."  *Beck v. Hamblen County*, 969 F.3d 592, 598 (6th Cir. 2020) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

Murray contends that Dr. Heyd violated Murray's Eighth Amendment rights.  The Eighth Amendment protects an individual from "cruel and unusual punishments."  U.S. Const. amend. VIII.  A government official violates an incarcerated person's Eighth Amendment rights when

the official shows "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

An Eighth Amendment claim against a government official has both an objective and a subjective component. *Richmond v. Huq*, 885 F.3d 928, 937–38 (6th Cir. 2018). In this case, Dr. Heyd does not dispute the objective component of Murray's deliberate-indifference claim (i.e., that Murray had a sufficiently serious medical need, *see Mattox v. Edelman*, 851 F.3d 583, 597 (6th Cir. 2017)). The subjective component, therefore, is the only issue before us in evaluating whether Dr. Heyd violated Murray's Eighth Amendment rights.

Our subsequent analysis proceeds in two parts. First, we examine whether Dr. Heyd violated Murray's identified Eighth Amendment rights by analyzing the subjective component of the deliberate-indifference claim. We next examine whether the rights that Murray identifies were clearly established at the time of Dr. Heyd's conduct.

### 1.      *The subjective component*

Under the subjective component of an Eighth Amendment claim, the plaintiff is required to show that "the official knew of and disregarded an excessive risk to inmate health or safety." *Richmond*, 885 F.3d at 939 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (alterations omitted)). If an official fails to "adhere to a prescribed course of treatment," the official's actions "may satisfy the subjective component of an Eighth Amendment violation." *Id.* A simple mistake in medical judgment, however, does not amount to deliberate indifference. *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (citing *Estelle*, 429 U.S. at 107–08). Instead, "the plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Id.* (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). Such a "showing requires proof that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal quotation marks omitted)). We conclude that there is sufficient evidence in the record for a jury to find (1) facts from which the inference

of a substantial risk of serious harm to Murray's health could be drawn, and (2) that Dr. Heyd knew of and disregarded that substantial risk.

### a.  Facts from which the inference of substantial risk of serious harm could be drawn

The facts show that there was a substantial risk of harm in Dr. Heyd's failure to monitor Murray's INR level.  As previously mentioned, the hematology-consult team's plan recommended that Murray should have "a fair trial of Coumadin with an INR ranging between 2.5 and 3."  Dr. Heyd attests to the fact that "[w]hen administering Coumadin, blood tests must be performed to determine the INR (International Normalized Ratios) level."

Yet the record shows that Murray's INR level was not being regularly monitored. Murray's INR level was only 1.3 on December 22, 2011, which was far below the established treatment plan.  But Dr. Heyd did not adjust Murray's Coumadin dosage accordingly.  Murray also presented to the prison's medical staff on multiple occasions between December 22, 2011 and January 31, 2012 to complain of migraine headaches, nausea, and vomiting, which, according to one of Murray's expert witnesses, are "signs and symptoms of cerebral edema."  On January 31, 2012, Murray was finally seen by Dr. Heyd and demonstrated "signs and symptoms of viral and gastrointestinal illness with fever and chills."  But no blood draw had occurred since December 22, 2011, and Dr. Heyd did not review the results of this most recent blood draw. Nonetheless, he noted that Murray's INR test was overdue.

Dr. Heyd argues in his opening brief that he did not know some of these facts and that the magistrate judge and the district court wrongly concluded that Dr. Heyd "was aware of Murray's blood clotting condition and the OSU hematology directive[.]"  He also claims that he must not have seen this information because his initials are not on the chart.  But our jurisdiction over this interlocutory appeal is contingent upon the acceptance of Murray's asserted facts, so we must disregard Dr. Heyd's attempt to establish a factual dispute at this juncture.

#### b.       *Drawing the inference of a substantial risk of serious harm and disregarding it*

A reasonable jury could find, based on the facts viewed in the light most favorable to Murray, that (1) Dr. Heyd drew the inference that failing to regularly assess Murray's INR level and Coumadin dosage would place Murray at a substantial risk of serious harm, and (2) Dr. Heyd disregarded that risk by failing to ensure that Murray's INR level was regularly tested. Dr. Heyd claims that "there is no evidence in the record that Dr. Heyd had actual knowledge that Plaintiff's INR level was 1.3 when Dr. Heyd viewed Plaintiff's file on December 28th, 2011. None at all." But the blood-draw results were marked with a stamp showing that the Lebanon Correctional Institution's Deputy Warden of Special Services received the results on December 23, 2011. The record provides no explanation for why Dr. Heyd—the Chief Medical Officer who is responsible for the care of all of the individuals incarcerated at the Lebanon Correctional Institution—failed to see the results of this crucial blood test.

On December 28, 2011 and again on January 18, 2012, Dr. Heyd noted that Murray should have an INR test performed within 10 days. But these tests never occurred, and Murray asserts that he did not refuse or knowingly miss any blood draws while he was incarcerated. Dr. Heyd's progress note from January 31, 2012 reflects that he knew that Murray was overdue for his INR test, showing "PT/INR (overdue)." In his opening brief, Dr. Heyd attempts to establish a dispute of fact as to whether Murray failed to appear for these blood draws. But, again, Murray's assertion of the facts guides our analysis at this stage of the case.

Given that Dr. Heyd knew that frequent blood tests must be performed when administering Coumadin, he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [] also dr[ew] the inference." *See Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. at 825, 837 (1994)). He "'then disregarded that risk' by failing to take reasonable measures" to get Murray's blood tested and to properly monitor Murray's Coumadin dosage. *See Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Although nurses sporadically saw Murray for treatment, "[a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). A person who is incarcerated need not show "that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *Id.* (citation and internal quotation marks omitted). For example, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not simply ignored." *Id.* (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000) (internal quotation marks omitted)). Although Murray received some treatment over the month of January, Dr. Heyd never properly monitored Murray's INR levels. A jury could, therefore, find deliberate indifference even though Murray was not simply ignored.

### 2.  *This case is similar to the Sixth Circuit's recent decisions in* **Richmond** *and* **Darrah**

Murray's deliberate-indifference claim is similar to the claims presented in both *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), and in *Darrah v. Krisher*, 865 F.3d 361 (6th Cir. 2017)—two other cases in which this court found that plaintiffs presented viable deliberate-indifference claims. In *Richmond*, this court reversed the district court's grant of qualified immunity, concluding that a reasonable jury could find that a jail's medical director had delineated a course of treatment but failed to view the plaintiff's chart, "which would have made [the director] aware of the risk that Jail medical staff . . . would continue to fail to adhere to his prescribed plan of care, and that [the director] subsequently disregarded that risk by failing to ensure that his orders were implemented as prescribed." *Id.* at 940.

Murray presents a similar claim to the one that this court discussed in *Richmond*. He asserts that Dr. Heyd failed to adhere to Murray's treatment plan that was established by the Ohio State University hematology-consult team. Dr. Heyd understood the importance of monitoring an individual's INR level when that individual is taking Coumadin and (based on the facts proffered by Murray) was aware of the hematology-consult team's established plan of care.

He was also aware that Murray's INR level was not being tested with regularity. Dr. Heyd thus was aware of the risk that Murray faced and yet "subsequently disregarded that risk by failing to ensure that his orders were implemented as prescribed[,]" just like the medical director in *Richmond*. *See id*. at 940. This "finding of the failure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference to an inmate's serious medical needs." *Id.* at 940–41.

Murray's claim is also analogous to that in *Darrah*, where this court reversed the district court's decision to grant qualified immunity to the chief medical officer of a prison and determined that unresolved issues of fact existed as to whether the prison doctor acted with deliberate indifference in treating the plaintiff's psoriasis. 865 F.3d at 368–69. The plaintiff showed that his psoriasis and the need for medication were known to the doctor, but the need was not addressed for three months. *Id*. at 369. Eventually, the doctor in *Darrah* placed the plaintiff on a drug for his psoriasis, but the drug proved to be ineffective. *Id.* The plaintiff reported to the doctor and continued to complain that the drug was not alleviating his pain. *Id.*

Rather than use a drug that had previously been effective in treating the plaintiff, the doctor in *Darrah* increased the dosage of the ineffective drug and advised the plaintiff to continue to take it. *Id.* This court concluded that, although the doctor monitored the plaintiff while he was on the drug, "the question of whether it was reasonable to continue to keep him on a drug that had proven ineffective and whether that course of treatment constituted deliberate indifference is a question best suited for a jury." *Id.* at 370.

Similarly, in this case, Dr. Heyd saw Murray (albeit only once) during the relevant timeframe between December 22, 2011 and February 6, 2012. A jury could find that Dr. Heyd moved at a "lackadaisical pace" in ascertaining Murray's INR level and adjusting his Coumadin dosage, considering the seriousness of Murray's condition. *See id*. at 369. Dr. Heyd was also aware of the fact that Murray's INR level was fluctuating, and these frequent fluctuations required adjustments to his Coumadin dosage, as evidenced by the fact that Dr. Heyd altered the dosage three times between November 21, 2011 and December 21, 2011. His failure to monitor Murray's INR level thereafter in light of this knowledge raises a jury question as to whether he was deliberately indifferent to Murray's serious medical needs.

**D.      Whether Murray's Eighth Amendment rights were clearly established**

Having concluded that Dr. Heyd's alleged conduct is sufficient to raise a jury issue regarding the subjective component of the deliberate-indifference claim at this stage of the case, we now turn to the second prong of the qualified-immunity analysis and examine whether the rights that Murray identifies were clearly established at the time of Dr. Heyd's conduct. The second prong "sets a high bar because it requires a plaintiff to identify with 'a high degree of specificity' the legal rule that a government official allegedly violated." *Beck v. Hamblen County*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[.]" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted). Rather, "there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts," so long as "the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope*, 536 U.S. at 741).

Courts have frequently rejected officials' contentions that a "legal duty need . . . be litigated and then established disease by disease or injury by injury" in the context of Eighth Amendment claims. *Estate of Clark v. Walker*, 865 F.3d 544, 552, 553 (7th Cir. 2017) (rejecting an officer's argument "that the clearly established prohibition on deliberate indifference to prisoners' and jail inmates' risk of suicide is too general to be enforceable for purposes of qualified immunity"); *see also Rafferty v. Trumbull County*, 915 F.3d 1087, 1097 (6th Cir. 2019) ("[T]he Supreme Court 'does not require a case directly on point if existing precedent has placed the statutory or constitutional question beyond debate.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations omitted))); *Sandoval v. County of San Diego*, 985 F.3d 657, 680 (9th Cir. 2021) (finding a constitutional violation where, "[t]o be sure, we have never before addressed the specific factual circumstances here").

Murray argues that in 2011 and 2012—when Dr. Heyd was treating him—the two constitutional rights at issue in this case were already clearly established. Those rights are (1) the Eighth Amendment right to be free from the denial or delay of adequate treatment for

serious medical needs, and (2) for prison officials to diligently carry out the prescribed treatment plan.  As discussed below, both rights were clearly established at the time that Dr. Heyd was treating Murray.  We address each of them separately in the following analysis.

### 1.      *Denial or delay of adequate treatment for serious medical needs*

"As early as 1972, this court stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'"  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)).  "The principle at issue—namely that a doctor cannot 'consciously expose a patient to excessive risk of serious harm' while providing medical treatment—is enshrined in [the Sixth Circuit's] caselaw." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 685 (6th Cir. 2013) (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) (alterations omitted)).

Relatedly, an inmate's right to medical care that is not unreasonably delayed has been clearly established since at least 2001, at which point this court adopted the holding that "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001) (alteration omitted).  Murray placed such verifying medical evidence in the record through the report of his expert witness, Dr. Goldberg.  The report established that, as a result of Dr. Heyd's "failures[,] which were breaches of the standard of care, Mr. Murray developed a cerebral venous thrombosis which was directly caused by failure to maintain therapeutic INR levels[,] especially in view of his known hypercoagulable state[.]"  Dr. Goldberg concluded that "[t]he thrombosis . . . caused symptoms of severe headaches and caused papilla edema which resulted in [permanent] ocular blindness."

### 2.      *The right to have Dr. Heyd adhere to a treatment plan*

*Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), clearly delineated an incarcerated individual's right to adherence to a treatment plan.  This right, however, was clearly established long before this court's 2018 decision in *Richmond*.

In *Richmond*, the district court granted summary judgment in favor of the defendants because the court found that the plaintiff had failed to show deliberate indifference. *Id.* at 947 n.9. But this court reversed in part, holding that summary judgment was improper as to some of the defendants. *Id.* at 949. The court stated that "[t]he proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled" since the Supreme Court decided *Estelle v. Gamble*, 429 U.S. 97 (1976). *Id.* at 947 (quoting *Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012)). Further authority was cited in *Richmond* for the proposition that "this Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation." *Id.* at 947–48 (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844–45 (6th Cir. 2002); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991)).

The caselaw predating *Richmond* specifically established "that interruption of a prescribed plan of treatment could constitute a constitutional violation." *Boretti*, 930 F.2d at 1154 (citing *Estelle*, 429 U.S. at 105). This precise line of cases extends into *Richmond*. We therefore apply this caselaw to the present case to conclude that the right to the adherence to a prescribed plan of treatment was clearly established at the time of Dr. Heyd's conduct.

Under these circumstances, a jury could reasonably find that Dr. Heyd "knew of and disregarded an excessive risk to [Murray's] health or safety[,]" *see Richmond*, 885 F.3d at 939 (alterations omitted) (citing cases in this circuit dating back to 1991) and was thus deliberately indifferent to his serious medical needs, *see Estelle*, 429 U.S. at 105–06. If the jury so finds, then Dr. Heyd violated Murray's clearly established rights under the Eighth Amendment based on caselaw that predates the relevant timeframe in this case.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.